Commonwealth, Appellant, *v.* Froelich.

Argued November 30, 1973. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

*William H. Lamb,* District Attorney, with him *F. Ned Hand,* Assistant District Attorney, for Commonwealth, appellant.

*John E. Stively,* for appellee.

OPINION BY MR. JUSTICE NIX, October 16, 1974:

Appellee Froelich was indicted and found guilty before a jury of the statutory crimes of blackmail and

extortion. Post-trial motions were filed and the trial court after argument granted a motion in arrest of judgment and the Commonwealth appealed. The Superior Court affirmed, *per curiam*, without opinion. *Commonwealth v. Froelich*, 224 Pa. Superior Ct. 745, 301 A.2d 884 (1973). We granted allocatur and we now reverse.

Where, as here, a jury has convicted the defendant of certain charges and the Commonwealth appeals from the trial court's grant of a motion in arrest of judgment, our task is to determine whether the evidence offered by the Commonwealth was sufficient to support the jury's verdict. *Commonwealth v. Blevins*, 453 Pa. 481, 309 A.2d 421 (1973). To sustain the trial judge, we must find that, ". . . accepting all of the evidence and all reasonable inferences therefrom, upon which, if believed the jury could properly have based its verdict, it would be nonetheless insufficient in law to find beyond a reasonable doubt that the appellee is guilty of the crime charged." *Commonwealth v. Blevins, supra*, 453 Pa. 483, 309 A.2d at 422. *See also, Commonwealth v. Williams*, 455 Pa. 539, 316 A.2d 888 (1974); *Commonwealth v. Ponton*, 450 Pa. 40, 299 A.2d 634 (1972); *Commonwealth v. Commander*, 436 Pa. 532, 260 A.2d 773 (1970); *Commonwealth v. Frye*, 433 Pa. 473, 252 A.2d 580 (1969).

A review of the record satisfies us that the jury had ample evidence upon which it could properly support its finding of guilt on the bill of indictment charging blackmail and also the indictment charging extortion. We therefore hold that the trial court was in error in the grant of a motion in arrest of judgment and that the verdict of the jury must be reinstated.

The indictment charging blackmail was based upon section 801[1] of The Penal Code which provides: "Who-

---

[1] Act of June 24, 1939, P. L. 872, §801, 18 P.S. 4801.

ever by means of written, printed or oral communications, intimidates, or levies blackmail, or extorts money, property or other valuable thing from any person or by such means attempts to intimidate, annoy, or levy blackmail, or extort money, property or other valuable thing from any person, is guilty of a misdemeanor. . . ."

In *Commonwealth v. Neubauer*, 142 Pa. Superior Ct. 528, 16 A.2d 450 (1940), the Superior Court in discussing substantially the same language as that appearing in Section 801[2] properly observed: "To extort is to wrest from, to exact, to take under a claim of protection, or the exercise of influence contrary to good morals and common honesty. Threats and violence may be used but are not necessarily involved in the offense described. The exercise of dishonest ingenuity in creating the impression of influence to protect from crime may amount to the exacting of money or other property." (Citations omitted.) 142 Pa. Superior Ct. at 533, 16 A.2d at 452.

The other indictment charging extortion was drawn under the Act of June 24, 1939, P. L. 872, §318, 18 P.S. §4318, which provides: "Whoever, being a public officer, willfully and fraudulently receives or takes any reward or fee to execute and do his duty and office, except such as is or shall be allowed by some act of Assembly, or receives or takes, by color of his office, any fee or reward whatever, not, or more than is, allowed by law, is guilty of extortion, a misdemeanor. . . ."

The criminality described in this section consists in the willful and fraudulent receipt of and/or taking of a reward or fee by color of office.

Although the taking of or receipt of the fee or reward must be under the color of the official's office, this does not necessarily mean to imply that it must be taken for an act or service which he has a duty to perform or even that he must have the power, by virtue of the au-

---

[2] Act of June 9, 1911, P. L. 833, §1, 18 P.S. §2932.

thority vested in him, to perform the act. It is sufficient if the official asserted that he possessed the power to perform the act for which the fee was received. *Commonwealth v. Wilson,* 30 Pa. Superior Ct. 26 (1906).

With this understanding of the nature of the charges we must now turn to the evidence produced during the course of the trial. The Commonwealth offered testimony to establish that Wesley Froelich, the appellee, was a duly certified justice of the peace and in that capacity had received a criminal complaint accusing one Sydney Kaufman of the crime of rape. After his arrest, Kaufman appeared before the appellee for the purpose of having bail set. During this proceeding Froelich is alleged to have suggested a particular individual to post bond to avoid having the matter "go to West Chester and then we cannot pay those pigs (apparently referring to the complainants) off." The next meeting between Kaufman and Froelich occurred at the time of the preliminary hearing. Kaufman described the conversation that then took place as follows: "A. Mr. Froelich told me that it would be in my best interest, because it would preserve my reputation, my job, my wife and family, and all kinds of sad stories; he told me that he could avoid me from having—by paying those pigs off—that is his words—and I told him— Q. Do you know who he was referring to? A. Yes. Q. Who? A. These ladies that—like Miss Long and Miss Goodwin. Q. And he said you could avoid all this by— A. Yes, and it would only be $700. So I told him for no money at all I would want them, if they accused me of rape, and they do it unjustly, then let them go to San Quentin. That is what I told him, and furthermore, I told Mr. Froelich, I don't have any money of that kind. I showed him that I only had a $10 bill of my own and I showed him money that belonged to the company out of another pocket, and while I was telling him that this is not my money, it is company money,

he took that money out of my hands, and said, that will quiet those pigs down. Q. How much money was there? A. $200. . . . Q. And what did Mr. Froelich say to you at that point? A. He said to me, to go outside and wait on the grass and he told everybody in the adjacent courtroom, which is in the basement, he told us to walk out, there is a storm door, something like an open door that you can go from the outside into the basement, and he told us all to go on the grass. A few minutes later he opened the door; he says, 'It is all over, you can go home.' That is the whole story. . . . Q. What did he tell you he was going to do? A. He was going to call these women and tell them, it is all over."

The evidence further established that the prosecution was terminated after that proceeding and that although the principal complainant did agree to the withdrawal of the charges, she testified that she did not receive any money from the appellee.

From this testimony the jury was free to find, as it apparently did, that a public officer, under the color of his office, unlawfully took a fee to discharge a duty of his office or in the alternative to refrain from performing his duty depending upon whether they viewed the termination of the proceedings at that juncture appropriate in view of the complainant's agreement to withdraw the charges. In either event the charge under section 318 would then have been established. The testimony also supports the finding that the appellee exacted from Kaufman upon a promise to exercise influence contrary to good morals the sum of $200. Thus, the finding of guilt under section 801 was also appropriate.

The court below, however, interpreted our decision in *Commonwealth v. Burdell*, 380 Pa. 43, 110 A.2d 193 (1955) as requiring a degree of consent on the part of the victim in cases of extortion and blackmail that would be incompatible with any element of coercion or

duress. Such a view is obviously erroneous and at variance with the very essence of the crimes of blackmail and extortion.

In *Commonwealth v. Burdell, supra,* we observed: "In robbery the taking of property is *against the will by means of force or violence,* while in extortion the taking is *with the consent* of the victim, induced, as it may be, by the threat of some exposure or the making of some criminal charge whether false or otherwise: People v. Peck, 43 Cal. App. 638, 642, 643, 185 P. 881, 882, 883; State v. Casto, 120 Wash. 557, 207 P. 952; People v. Anderson, 59 Cal. App. 408, 426, 211 P. 254, 261, 262; McKeown v. State, 34 Okla. Cr. 381, 246 P. 659; 77 C.J.S. 447, §1." 380 Pa. at 48, 110 A.2d at 196. In *Burdell, supra,* we were merely restating the traditionally accepted distinction between robbery and extortion. This statement, however, is not to imply that for the transfer of possession from the victim to the accused to possess the requisite consent for extortion it must necessarily be free of all compulsion. Extortion and blackmail have always been recognized as embracing an element of coercion or intimidation. However, as has been noted by some text writers, the use of the concept of consent in this context is not necessarily the most informative method of distinguishing between the crimes.

"It is sometimes said that robbery differs from statutory extortion in those states which require property acquisition in that in the former the taking of property must be 'against the will' of the victim, while in the latter the taking must be 'with the consent' of the victim, induced by the other's unlawful threat; but, in spite of the different expressions, there is no difference here, for both crimes equally require that the defendant's threats induce the victim to give up his property, something which he would not otherwise have done." La Fave & Scott, *Criminal Law,* 707 (1972).

The historical development of these crimes best explains what may otherwise appear to be an inconsistency. Robbery at common law was a taking from the person accomplished by violence or intimidation and, as a felony, it was punishable by death. Because of the severity of the punishment upon conviction the common law courts were most circumspect, in robberies by intimidation, in limiting the type of threats to be included therein. Where the threat was of immediate personal violence the earlier courts were satisfied that the punishment provided was appropriate.[3] Later, the lesser crimes of extortion and blackmail evolved to cover other types of intimidation which were apparently viewed as presenting a lesser threat to personal security and thus not requiring the same severe punishment.

"—doubtless because the severe penalty for robbery, long a capital offense, restrained the courts from expanding robbery to include the acquisition of property by means of other effective threats—such as a threat to inflict future rather than immediate bodily harm, or to destroy the victim's property other than his house, or to accuse him of some crime other than sodomy, or to expose his failings or secrets or otherwise to damage his good name or business reputation. To fill this vacuum practically all states have enacted statutes creating what is in effect a new crime—in some states called statutory extortion, in others blackmail, and generally carrying a penalty less severe than for robbery." La Fave & Scott, *Criminal Law*, 705 (1972).[4]

---

[3] The common law also recognized as robbery a threat to destroy the victim's dwelling and a threat to accuse the victim of sodomy. See Perkins, *Criminal Law*, 324-25 (1957).

[4] See also Comment, A Rationale of the Law of Aggravated Theft, 54 Col. L. Rev. 84 (1954) ; Comment, Criminal Law, A Study of Statutory Blackmail and Extortion in the Several States, 44 Mich. L. Rev. 461 (1945).

Thus, whether we attempt to distinguish robbery from extortion and blackmail on a theory of "consent" to transfer possession of the property in question or look to the historical development of the crimes, it is evident that the crimes of extortion and blackmail do encompass a degree of coercion or intimidation. Therefore, the fact that Kaufman may well have been moved to allow Froelich to take possession of the $200, because of a fear of the effect of further prosecution upon his family life and general reputation, provides no basis for concluding that the crimes of extortion and blackmail had not been made out by the evidence. Under all of the evidence it is our view that the jury reached a justifiable verdict under an accurate charge on the law.

The order of the Superior Court affirming the order of the Court of Common Pleas is hereby reversed; the order allowing a motion in arrest of judgment is vacated and the jury verdict reinstated. The matter is to be remanded forthwith to the trial court for further proceedings consistent herewith.