383 A.2d 891

**COMMONWEALTH of Pennsylvania**

v.

**Julius A. DAVIS, Appellee (two cases).**

Supreme Court of Pennsylvania.

Argued Nov. 15, 1976.

Decided March 23, 1978.

F. Emmett Fitzpatrick, Dist. Atty., Steven H. Goldblatt, Asst. Dist. Atty., Chief, Appeals Div., Gaele Barthold, Philadelphia, for appellant.

Michael A. Seidman, Philadelphia, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION

MANDERINO, Justice.

Appellee, Julius A. Davis, was found guilty in a nonjury trial of murder in the third degree, criminal conspiracy, possession of an instrument of crime generally, and possession of a prohibited offensive weapon. Post-verdict motions for a new trial and in arrest of judgment were filed. The trial court did not consider the motion for a new trial but granted appellee's motion in arrest of judgment concluding that the evidence was insufficient. The prosecution appealed to this Court from the order arresting judgment of appellee's murder conviction. Appeals involving the other crimes were taken by the prosecution to the Superior Court and certified to this Court.

Both the prosecution and appellee agree that on the issue of the sufficiency of the evidence, the evidence, and all reasonable inferences arising therefrom, must be viewed in the light most favorable to the verdict winner. The effect of a motion in arrest of judgment is to admit all the facts which the prosecution's evidence tends to prove. *Commonwealth v. Froelich*, 458 Pa. 104, 326 A.2d 364 (1974); *Commonwealth v. Terenda*, 433 Pa. 519, 252 A.2d 635 (1969).

The parties disagree, however, as to whether the evidence is sufficient or insufficient. We hold that the trial court erred in concluding that the evidence was insufficient to support the convictions. The relevant portions of the trial court's opinion are as follows:

"The homicide in question occurred about 10:00 P.M., Friday, April 18, 1975, on the street in front of 3212–A McMichael Street, Philadelphia, an address in a public housing project. James Sturgis, the victim, was one of a group of persons who had been helping his cousin, Mason

Herndon, move his household goods from one apartment to another. The others in the group were Mason's brother, Floyd Herndon, Jr., his father, Floyd, Sr., and a juvenile member, a young girl whom the adults were delivering back to her own home, the McMichael Street address, in an automobile driven by Mason Herndon. Mason's age was 30, Floyd, Jr.'s 26, their father's 59. The occasion was semi-social; some drinking had been done. Post-mortem examination showed the victim to have been plainly drunk, and Mason Herndon admitted that he had had some drinks. He was also carrying an ordinary pocket knife for use in cutting cords or rope incident to his moving. Herndon's brother Floyd was inside the house to which the young girl was being delivered when Mason Herndon was accosted by a youth, identified in the testimony as 'Scottie' or Michael Scott, who approached his car and demanded to know what gang Herndon was from. Disclaimer by Herndon of any gang membership or affiliation was unavailing, young Scott contradicted his denials, the passengers in the car got out, and Scott yelled the rallying or war-cry 'Yo Yo.' which brought ten or a dozen of his supporters on the run out of nowhere to surround the Herndon party and car. Mason Herndon pulled his pocket knife, and was quickly knocked down, from which he was dazed some few minutes. A general altercation broke out and Herndon testified, as his senses cleared, he heard shots. The attacking gang ran away, and Sturgis was found on the ground expiring from a bullet wound in the back.

"None of the eyewitnesses were able to identify the person or persons doing the shooting, but there was agreement among several that more than one shot was fired, Mason Herndon testified they sounded as if coming from more than one gun, he saw a male figure using both hands to hold a handgun, and another eyewitness, Dickerson, saw someone in the band of attackers with a rifle. The bullet that killed Sturgis, recovered at autopsy, was of .25 caliber.

"Only the witness, Charles Ramel Owens, linked the defendant with the shooting. The testimony from Owens to this effect was that the following morning he called on the defendant at his home, asked him 'Who did the busting (shooting)?', and received from defendant the reply 'Me and Nut (a/k/a Peanut, properly Isaac Pyatt)'. Owens said he demanded the defendant give him the gun and that defendant handed over a .25 caliber pistol. The Police Ballistics Unit found five spent .25 caliber cartridge casings on the street and testfiring of the weapon received from the defendant by Owens eventually justified the Ballistics Technicians' conclusion that it had fired the bullet fatal to Sturgis.

"Owens, however, openly admitted in his testimony that he exerted himself to identify the gunman or gunmen in the fracas because he had learned overnight the homicide was being charged to one Gregory Johnson, at that time he had plans to marry Johnson's sister and his avowed motive was not only to have Johnson released but by securing the fatal weapon to keep it out of police hands and prevent the Commonwealth's successfully pursuing anyone. Owens had been in the neighborhood when the fight broke out, near enough to hear the shots but not to see the fight. He set out early next morning, Saturday, April 19, to visit houses of those he knew to have been members of the attacking gang in his effort to determine who had done the shooting. He testified he had been to 'quite a few houses' before arriving at the defendant's at 6:15 A.M. After securing the gun, he hid it and next day, he said, he walked into the 39th District Police Station and, in an effort, unsuccessful, to convince them they had the wrong person in custody, Gregory Johnson, he told the officers there that he had the murder weapon. To their warning him he could be charged with concealment of evidence, his reply, according to him, was that he didn't care, the murder weapon then would never be recovered, and the murder charge never successfully prosecuted. Despite this defiance, he said he was allowed to walk out.

"Owens' first hiding place for the gun was his own house, 3201–B Henry Avenue but because he was apprehensive the police might search the house and find it, he hid it a second time in a different place, 812 Diamond Street where he had a room. From there, eventually, on April 25, he took it into the Police Administration Building, 8th and Race Streets, Philadelphia, and surrendered it to Detective Grace. At the end of his questioning by the Court he said he hid the gun at 812 Diamond Street immediately on receiving it from defendant and denied having testified to two different hiding places. He also testified to having seen the gun long previously in the possession of one of his friends but first balked at naming the friend, and then asserted he could not remember.

"A further discrepancy in the testimony of Owens is that he first testified the date of his visit to the 39th District Police Station was April 25 and a few minutes later that it was Sunday, April 20. The discrepancies, the contradictions, and the plain withholding of certain evidence reflected in Owens' testimony, together with his private motive to lay the crime to the charge of someone other than Gregory Johnson, as well as his wilful and admitted obstruction of justice, in the Court's opinion make it impossible to accept his testimony as proving this defendant guilty beyond a reasonable doubt. The standard for the granting of a motion in arrest of judgment on the ground of insufficiency of evidence is that the Court find the evidence supporting the verdict of guilt to be so weak and inconclusive that a jury of reasonable men and women could not be satisfied as to the guilt of the defendant beyond a reasonable doubt. *Commonwealth v. Blevins*, 453 Pa. 481, 309 A.2d 421 (1973).

"The critical testimony in the present case, as viewed by the Post-Trial Hearing Judge, fails that test, and justifies the grant of the motion in arrest of judgment for insufficiency of evidence." (page numbers to notes of testimony deleted.)

Although the above facts make it clear that, without the testimony of Charles Ramel Owens there was no evidence linking appellee to the crime, and further, that a serious credibility question existed as to Owens' testimony, his testimony viewed in the light most favorable to the prosecution must be accepted as true. Since Owens testified that appellee admitted that appellee and a friend were responsible for the shooting and further testified that appellee gave him the murder weapon, the evidence was sufficient to sustain the convictions. The motion in arrest of judgment should not have been granted.

■ The trial court however did not consider the appellee's motion for a new trial stating the following:

> "Motions for new trial and in arrest of judgment were filed, but because the motion for new trial was in stereotype form, assigning no specific error, the Court was required to deny it, and declined to hear argument, pursuant to *Com. v. Blair*, 460 Pa. 31, n. 1, 331 A.2d 213, n. 1 (1975); see also Rule 1123(a), Pa. Rules of Criminal Procedure."

The trial court was correct in refusing to consider any issues not specifically assigned in the motion for a new trial. In this case, however, item no. 2 in the motion for a new trial stated that "the verdict is contrary to the weight of the evidence." This Court has said this is a proper ground for relief in a motion for a new trial. *Commonwealth v. Meadows*, 471 Pa. 201, 208–09, 369 A.2d 1266, 1270 (1977). *See Commonwealth v. Farquharson*, 467 Pa. 50, 354 A.2d 545 (1976); *Commonwealth v. Vogel*, 458 Pa. 200, 321 A.2d 633 (1974); *Commonwealth v. Dennison*, 441 Pa. 334, 272 A.2d 180 (1971). Although the appellee was not entitled to have issues considered which were not specified in his post-verdict motions, he was entitled to have the trial court consider issues specifically raised which included whether the verdict was contrary to the weight of the evidence. For this reason we remand the matter to the trial court to consider appellee's motion for a new trial. After the disposition of that motion appropriate appeals, if desired, may be taken.

204

The order of the trial court granting appellee's motion in arrest of judgment is reversed and the matter is remanded for a consideration of appellee's motion for a new trial.

JONES, former C. J., did not participate in the decision of this case.