505 A.2d 997

**COMMONWEALTH of Pennsylvania, Appellant,**

**v.**

**Jerry ROBINSON.**

Superior Court of Pennsylvania.

Argued Dec. 18, 1985.

Filed March 4, 1986.

310

Alan Sacks, Assistant District Attorney, Philadelphia, for Com., appellant.

Robert R. Redmond, Philadelphia, for appellee.

Before CIRILLO, MONTEMURO and POPOVICH, JJ.

POPOVICH, Judge:

This is an appeal by the Commonwealth from the order of the Court of Common Pleas of Philadelphia County granting a motion in arrest of judgment by the defendant/appellee, Jerry Robinson. We reverse.

The standard of review in such a case has been stated by this Court in *Commonwealth v. Nelson,* 245 Pa.Super. 33, 36, 369 A.2d 279, 280 (1976), aff'd 476 Pa. 269, 382 A.2d 715 (1977); to-wit:

> In reviewing an appeal from a trial court's granting of motion in arrest of judgment, we must determine whether the evidence offered by the Commonwealth was legally sufficient to support the verdict. *Commonwealth v. Froelich,* 458 Pa. 104, 326 A.2d 364 (1974). To reach this determination, we accept all of the evidence and all reasonable inferences therefrom, upon which the fact-finder could have based the verdict; we can affirm the granting of a motion in arrest of judgment if, viewed in that manner, the evidence was nonetheless insufficient in law

to find guilt beyond a reasonable doubt as to the crimes charged. *Commonwealth v. Blevins,* 453 Pa. 481, 309 A.2d 421 (1973). We must view the evidence in the light most favorable to the Commonwealth. *Commonwealth v. Hazlett,* 429 Pa. 476, 240 A.2d 555 (1968). Our task is the same whether the finder of fact was a jury or a judge sitting without a jury. *Commonwealth v. Meadows,* 232 Pa.Super. 292, 331 A.2d 827 (1974) [, aff'd 471 Pa. 201, 369 A.2d 1266 (1977) ].

Instantly, at a non-jury trial before the Honorable Joseph N. Bongiovanni, Jr., Philadelphia Police Officer James Joyce testified that on the 21st of September, 1982 he was working the "Granny Squad" in the Center City. Officers Cherry, Wilson and Smith were assigned in plainclothes to monitor Joyce during this stakeout. Joyce was attired as an elderly man.

At about 9:15 p.m., Joyce was walking north on 13th Street toward Cuthbert. He was openly counting money— five $1.00 bills wrapped around some play money. He then placed the money in the right coat pocket of his suit. At this point, Joyce looked up and saw, at a distance of about 15 feet, the defendant and another individual "appear[ing]" to look at him from across the street.

As the officer walked onto Cuthbert Street, he could hear somebody following him. After proceeding approximately 30 yards more, he turned around and noticed that the same two males who were looking at him earlier had traveled in his direction. He was approached by the defendant and was asked for a match. He responded he had none. With this, the two males started to walk away, side by side, in the direction of 12th Street. They walked approximately 7, 8 yards before they stopped and talked to each other. After talking for about 30 seconds, they came back to the officer.

The defendant was positioned about 6 feet away and right in front of the officer. The second male stood on the right side of the officer. Then, the defendant asked the officer for a cigarette. The officer stated he had none.

As told by the officer, the following sequence of events occurred:

At this point the male that was standing on my right hit me in my side ... [with h]is arm, his fist. He reached into my right suit coat pocket, and I grabbed his arm. He pulled away, pulled out. And we struggled for a second or two and he broke away.

At this time both males started running towards 12th Street ... together....

And I reached into my pocket, and the money was gone. So I yelled, "Give me back my money."

And at this time one of my backup officers, who was in a truck down close to 12th Street, jumped out of the van and came running towards them.... yelling, "Police." At that time they stopped, turned around and ran back past me towards 13th Street, at which time two officers from 13th Street were coming in off of 13th Street and Cuthbert. And at that time they stopped and they were arrested.

Police Officer Christopher Cherry corroborated Joyce's testimony. In particular, Cherry stated his attention was directed to the defendant and the second male because, as he put it, "[t]hey were staring" at Joyce from their position on the north side of Cuthbert and 13th Streets. Further, as Officer Cherry recalled, "They appeared to be talking. They were staring at the decoy and appeared to be some conversation between the two males." This witness was stationed 15–25 yards away from Joyce. From the witness' vantage point, he believed the two males were talking "[b]ecause their lips were moving."

Also, Cherry noted, that "these males immediately proceeded to follow Officer Joyce to the end of the street. They went in the same direction.... together." A couple of minutes later, the witness heard Officer Joyce holler, "Give me back my money."

Officer Joyce's shouting prompted Officer Cherry and the other two officers to converge on the scene. He "observed the defendant and the other male running westbound to-

wards [him] and Officer Wilson." "They were running together[, i.e., t]he other male was running maybe a step or steps in front of [the defendant] in the street." The two were immediately arrested and the second male dropped the money and raised his hands.

The case for the defense consisted of the accused taking the stand and testifying that he was 18 years old at the time of the incident—the second male was 15 years old and purportedly pleaded guilty to a variety of offenses. The defendant also offered that he had never been arrested and charged with a crime.

The prosecution stipulated to the good reputation of the defendant for being peaceful and law-abiding in the community. The defendant's mother, father and aunt were present and would have testified to the defendant's good reputation in the community for being a peaceful, law-abiding citizen.

The attorney for the defendant, during Officer Joyce's cross-examination, adduced that the statement given by said officer to a Detective Panakov a couple of hours after the incident never made mention that the defendant had been the one who asked for a match and a cigarette.

The trial court, taking all of the preceding into account, found the defendant guilty of robbery, two counts of theft, simple assault and conspiracy. A demurrer was sustained to the charge of reckless endangerment.

Following the filing of motions for a new trial and/or in arrest of judgment, but prior to their disposition, the trial judge left the bench. As a result, the Honorable Charles P. Mirarchi, Jr. was assigned to rule on the motions.

On March 26, 1984, briefs were filed and oral arguments were heard in which counsel for the defendant highlighted his version of the facts, wherein Officer Joyce concluded that the defendant and the second male had focused their eyes on him, and that a conversation ensued to effectuate, "inferentially", a robbery. Counsel contended that these

observations were not corroborated by any of the other officers.

Counsel also cited that Officer Joyce's attributing the defendant with asking for a match and, later on in the episode, for a cigarette was "impeached to the extreme" because neither during the preliminary hearing nor in the notes of Detective Panakov, to whom Joyce spoke after the robbery to reconstruct what happened, was there any mention of the defendant speaking.

Counsel contended that the prosecution had proven no more than the defendant's "presence at the scene of the crime." In other words, as stated by counsel, the defendant was "in the wrong place at the wrong time with the wrong people who decided to do something on their own motion, and this man [defendant] did not help him in any way under the circumstances."

Although the court had difficulty reconciling the reasonable inferences to be drawn from the defendant and the second male asking Joyce for a match, and then returning after a discussion between the two to inquire if the same individual had a cigarette, as one flanked the victim and the other stood in front of him. Nevertheless, the court found, despite the defendant's presence, that the evidence did not rise to the level of establishing culpability sufficient to sustain the convictions. Accordingly, the defendant's motion in arrest of judgment was granted. This appeal followed by the Commonwealth, the propriety of which we do not question since the issue involved is purely one of law. See *Commonwealth v. Melton*, 402 Pa. 628, 168 A.2d 328 (1961).

■ Unlike the post-trial court, we are unable to embrace its conclusion that the prosecution failed to establish, beyond a reasonable doubt, that Robinson was either a "moving party" or a "participant" in a criminal conspiracy to rob the victim.

On the quantum of proof necessary to establish a confederation, this Court has written:

The essence of conspiracy is a common understanding or agreement. *Commonwealth v. Fontana*, 265 Pa.Super. 387, 401 A.2d 1361 (1979). However, the Commonwealth is not required to establish the existence of a conspiracy by direct proof or an explicit or formal agreement. *Id.* "Indeed, direct proof of an explicit or formal agreement to commit a crime can seldom, if ever, be supplied and it need not be for 'it is established law in this Commonwealth that a conspiracy may be proved by circumstantial evidence as well as by direct evidence.'" *Commonwealth v. Roux*, 465 Pa. 482, 488, 350 A.2d 867, 870 (1976). The nature of the crime usually makes it susceptible of no other proof than by circumstantial evidence. *Commonwealth v. Evans*, 190 Pa.Super. 179, 154 A.2d 57 (1959), aff'd 399 Pa. 387, 160 A.2d 407 (1960), cert. denied, 364 U.S. 899, 81 S.Ct. 233, 5 L.Ed.2d 194, reh. denied, 364 U.S. 939, 81 S.Ct. 377, 5 L.Ed.2d 371. To assist the finder of fact in determining whether a corrupt confederation is present, the relationship and conduct of the parties and the circumstances surrounding their activities can be examined to deduce, inferentially, if a conspiracy exists. *Commonwealth v. Fontana*, supra.

*Commonwealth v. Tumminello*, 292 Pa.Super. 381, 386, 437 A.2d 435, 437–38 (1981).

On the culpability aspect of co-conspirators for the acts of one another, our Court has likewise spoken and stated:

... notwithstanding the fact that we are dealing with a situation in which the complained of assault was inflicted by someone other than the appellant, the law in Pennsylvania is settled that each conspirator is criminally responsible for the action of his co-conspirator, provided it is accomplished in furtherance of the common design, "even though one does not perform the immediate act [complained of]." (Citation omitted) *Commonwealth v. Bachert*, 271 Pa.Super. 72, 77, 412 A.2d 580, 583 (1980). Further, our Supreme Court, in discussing conspiratorial accountability, has held:

When there is evidence that one, who has not struck the fatal blow, has, nonetheless, shared in the criminal intent and the criminal activity, that person has aided and abetted in the commission of the crime and, thus, may be held responsible as an accomplice to another's acts and the consequences of those acts. *Commonwealth v. Rife*, 454 Pa. 506, 312 A.2d 406 (1973); *Commonwealth v. Wilson*, 449 Pa. 235, 296 A.2d 719 (1972); *Commonwealth v. Lowry*, 374 Pa. 594, 98 A.2d 733 (1953). *"The least degree of concert or collusion between parties to an illegal transaction makes the act of one the act of all." Commonwealth v. Strantz*, 328 Pa. 33, 40, 195 A. 75, 79 (1937). (Emphasis added)

*Commonwealth v. Vaughn*, 459 Pa. 35, 39–40, 326 A.2d 393, 395 (1974).

Moreover, as noted in *Commonwealth v. Cox*, 466 Pa. 582, 586, 353 A.2d 844, 846 (1976):

... the Commonwealth was not required to establish that appellant was part of the joint effort to cause the [commission of a crime upon] ... the victim by direct evidence. This burden may be sustained by means of wholly circumstantial evidence.

*Commonwealth v. Ford*, 315 Pa.Super. 281, 288–289, 461 A.2d 1281, 1284–85 (1983).

Based on the preceding, a review of the evidence in toto, giving the verdict-winner the benefit of every reasonable inference therefrom, reveals to us more than the defendant's mere presence at and flight from the scene of the crime. Quite the contrary, we find that the defendant/appellee was an "active partner" in a plan to rob Joyce, and whether it was the brainchild of Robinson or his 15-year-old confederate is of no consequence in our finding the existence of a conspiracy.

█ Albeit Joyce's testimony regarding which one of the two individuals asked him for a match and a cigarette was

inconsistent with what he told Detective Panakov,[1] we note that Joyce's trial testimony was consistent with his October 19, 1982 preliminary hearing recollection of what occurred. We are not persuaded that Joyce's confusion rendered the evidence so weak and inconclusive as to warrant an arrest of judgment and discharge. Furthermore, an examination of the post-trial court's opinion in support of granting the motion in arrest of judgment reveals that the court, in passing on the motion, engaged in a weighing of the evidence, rather than determining whether the quantum of evidence needed to establish some proof of the elements of the crimes was in esse. For example, the post-trial court's opinion makes reference to the "discrepancy" existing in the victim's testimony as to who initially spoke to him regarding a match and, later, a cigarette. (See Opinion at 3–4)

■ In view of the fact that the initial verdict was guilty, it was not the function of the post-trial court, who, in this instance, was not the jurist who observed the demeanor of the witnesses on the stand, their promptness or hesitancy, if any, in answering the questions posed, to engage in a reevaluation of Joyce's credibility and the weight to be attached thereto. As such, the post-trial court did not follow the standard articulated *supra* for considering a motion in arrest of judgment, but rather weighed the evidence. See *Commonwealth v. Meadows*, 471 Pa. 201, 369 A.2d 1266 (1977).

■ It is "not a question as to whether the [post-]trial judge, if he had been trier of fact would have acquitted, but rather whether the evidence would justify a finding of guilty" by the finder of fact. *Commonwealth v. Blevins*, 453 Pa. 481, 487, 309 A.2d 421, 424 (1973). Consistent with the aforesaid, our law has never required that the prosecution prove any element of a crime beyond all possible doubt

1. We would point out that defendant's trial counsel could not disprove that the notes of Detective Panakov made mention of the fact that, as to the match and/or the cigarette, "They asked...." Joyce was not inaccurate.

or to exclude completely the possibility of accident. *Commonwealth v. Garrett*, 423 Pa. 8, 12, 222 A.2d 902, 905 (1966). All that is required is that proof rise to the level of "beyond a reasonable doubt". *Commonwealth v. Finnie*, 415 Pa. 166, 202 A.2d 85 (1964).

 Even though the above facts make it clear that, without the testimony of Officer Joyce there was no evidence linking the appellee to the crime, and, further, that a credibility question existed as to his testimony, Joyce's testimony, viewed in the light most favorable to the prosecution, must be accepted as true. See *Commonwealth v. Davis*, 477 Pa. 197, 383 A.2d 891 (1978). Even conceding the contradictory versions to which Joyce testified at trial, this matter is merely a circumstance which the trier of fact would consider in making his determination of whether or not to credit the testimony. See *Commonwealth v. Boyle*, 470 Pa. 343, 368 A.2d 661 (1977).

Accordingly, based on the record and the reasonable inferences to be drawn therefrom, we have no reluctance in finding that the appellee and the second male followed Joyce onto Cuthbert Street after observing him count his money, and that the appellee inquired of him if he had a match. Upon being told he had none, the duo proceeded but a short distance before conferring, and, thereafter, returning a second time to ask if the victim had a cigarette.

When Joyce gave the defendant the same response as before, he was struck in the side by the second male and robbed. The defendant watched this entire incident. Then, he left in tandem with his cohort, both running almost side by side down the street to escape with their ill-gotten gain. Their foray was short-lived as they were immediately arrested with booty in hand. We find such evidence sufficient to sustain the appellee's convictions, and not so weak and inconclusive as to warrant an arrest of judgment. See *Commonwealth v. De Petro*, 350 Pa. 567, 578, 39 A.2d 838, 843 (1944).

As a matter of course, we would ordinarily return the record to the court below to consider further the pending motion for a new trial. However, the reasons assigned therein and in support thereof lack merit. They are four in number urging that the verdict was contrary to the evidence, law, weight of the evidence and was not fairly rendered. The record clearly discloses that a new trial should not be granted for any of these asserted reasons. See *Commonwealth v. Tabb,* 417 Pa. 13, 207 A.2d 884 (1965), and compare with *Commonwealth v. Meadows, supra.*

Order of the court below arresting the judgment of sentence and discharging the appellee is reversed, and the case is remanded for the imposition of sentence. Jurisdiction is relinquished.