521 A.2d 53

COMMONWEALTH of Pennsylvania, Appellant,

v.

Daniel L. LANAGER.

Superior Court of Pennsylvania.

Argued Dec. 2, 1986.

Filed Feb. 11, 1987.

Ernest J. DiSantis, Jr., Assistant District Attorney, Erie, for Commonwealth, appellant.

John H. Moore, Erie, for appellee.

Before CIRILLO, President Judge, and ROWLEY and POPOVICH, JJ.

POPOVICH, Judge:

This is an appeal by the Commonwealth from the orders [1] of the Court of Common Pleas of Erie County granting the motion in arrest of judgment (at Nos. 1521 and 1651 of 1983) of the defendant/appellee, Daniel L. Lanager. We reverse.

The standard of review in such a case has been re-stated by this Court in *Commonwealth v. Robinson*, 351 Pa.Super. 309, 311–12, 505 A.2d 997, 998 (1986); viz.:

> In reviewing an appeal from a trial court's granting of motion in arrest of judgment, we must determine whether the evidence offered by the Commonwealth was legally

---

1. The separate orders were issued the same day and were in response to a single motion for a new trial and/or in arrest of judgment by the appellee covering two Informations (at Nos. 1521 and 1651 of 1983) charging delivery of controlled substances and conspiracy to do the same.

   The trial court could have disposed of the motion with a single order since the charges were heard together. Therefore, the appeal of the two orders is countenanced given the circumstances out of which they arose. Compare *General Electric Credit Corp. v. Aetna Casualty and Surety Co.*, 437 Pa. 463, 263 A.2d 448 (1970).

sufficient to support the verdict. *Commonwealth v. Froelich*, 458 Pa. 104, 326 A.2d 364 (1974). To reach this determination, we accept all of the evidence and all reasonable inferences therefrom, upon which the fact-finder could have based the verdict; we can affirm the granting of a motion in arrest of judgment if, viewed in that manner, the evidence was nonetheless insufficient in law to find guilt beyond a reasonable doubt as to the crimes charged. *Commonwealth v. Blevins*, 453 Pa. 481, 309 A.2d 421 (1973). We must view the evidence in the light most favorable to the Commonwealth. *Commonwealth v. Hazlett*, 429 Pa. 476, 240 A.2d 555 (1968). Our task is the same whether the finder of fact was a jury or a judge sitting without a jury. *Commonwealth v. Meadows*, 232 Pa.Super. 292, 331 A.2d 827 (1974) [, aff'd 471 Pa. 201, 369 A.2d 1266 (1977)].

For ease of presentment, and with the preceding in mind, the facts underlying each of the two Informations will be discussed separately.

### No. 1521 of 1983

At 3:30 p.m. on the 3rd of February, 1983, undercover narcotic Agents Shoup and Mohn were introduced to the defendant by a confidential informant (Marla). A discussion ensued in which the defendant was asked whether he could obtain some "sets", which is street jargon for two Tylenol No. IV tablets and one Doriden tablet. The defendant stated he could obtain them and to follow him and Marla into Erie.

With Marla driving, the defendant stopped in front of the "Good Cook's Bar and Restaurant". The agents parked directly behind the defendant. As the agents sat in their vehicle, they could see as the defendant hailed a black male, later identified as Hardy Ray "Skeeter" Gowdy, and the two engaged in a conversation through the window on the passenger side where the defendant was seated. Gowdy entered the vehicle and sat directly behind the defendant. Then, the first vehicle pulled forward another one hundred

feet with the agents following. Marla, thereafter, got out of the driver's side, walked back to the agents and asked for thirty dollars to purchase some drugs. Agent Shoup complied and Marla returned to the lead vehicle.

By this time, Gowdy had exited Marla's vehicle and was standing along the passenger side. Both agents testified to seeing Gowdy pull a plastic pill bottle from his jacket pocket. The bottle was opened and a quantity of white tablets were emptied by Gowdy into his own hand. These pills were observed being given to the defendant through the open passenger window.

The first bottle was closed and returned by Gowdy to his pocket. He then produced a second bottle of pills from his pocket, emptied a portion of its contents (white pills) into his hand and again handed them to the defendant through the open window. After Gowdy walked away, Agent Shoup walked to the driver's side of Marla's vehicle and observed a number of white tablets in the defendant's left hand. When the agent asked, ". . . did we get them, were we able to get them . . .," the defendant said, "Yeah."

The two vehicles proceeded to an open area to park. The confidential informant alighted from her vehicle and walked to the agents' vehicle and handed Agent Mohn two "sets", i.e., four Tylenol No. IV and two Doriden tablets. At this point, Agent Mohn walked up to where the defendant was seated and was advised by the defendant that he had to be very careful because certain individuals from Buffalo, who dealt in large quantities of "sets", were after him as a result of a previous dealing he had with them. Also, he led the agent to believe that he was in possession of a weapon.

Agent Mohn returned to his vehicle and left the area with Agent Shoup. The pills were analyzed at the Pennsylvania State Police laboratory, and the results confirmed that the pills were controlled substances.

### No. 1651 of 1983

At about 10:45 a.m. on the 11th of February, 1983, Agent Shoup phoned the defendant and inquired about obtaining

"an additional quantity of some sets." The defendant asked the agent to phone back later. The agent did so at 11:09 a.m. and was informed by the defendant that "he would be able to arrange a deal later that morning." The agent was also asked to go to the defendant's residence "to conduct the transaction." The agent did so about 12:00 noon and found the defendant in the company of one Denny McGavits. The agent, as he was seated at the kitchen table, was patted down by the defendant "to make sure that [he] was not the police." The two then conversed about the possibility of securing some "sets". The defendant asked how many he wished to purchase. The agent indicated ten "sets" at a price of one hundred dollars. The defendant informed the agent that he was waiting for a girl to arrive (Marla). Once she arrived at 1:00 p.m., the defendant stated, "... we could go to conduct the transaction."

With Marla driving, the defendant proceeded, again, to "Good Cook's" bar and parked. The agent followed and had McGavits as a passenger.

From the agent's vantage point behind the defendant, he saw the defendant exit Marla's vehicle and speak briefly to a black male, but this individual continued walking. The defendant was then approached by a Curtis Henderson and the two spoke on the corner of the intersection. When the agent tried to get involved in the transaction, the defendant advised him to wait in the vehicle, that "he would handle everything ... take care of things". The agent did so and could see the defendant and Henderson talking for several minutes. The two proceeded to Marla's vehicle and Henderson informed the agent to follow the defendant. Henderson rode with the defendant and Marla about fifteen blocks and parked. The defendant and Henderson emerged, and the agent approached the two and was told by Henderson that he would have to wait as Henderson went to get the "sets". Henderson returned within thirty minutes and everyone sat in Marla's vehicle. Henderson, who was seated in the left, rear seat, instructed her to drive.

During the drive, Henderson turned to face the agent, who was seated in the right, rear position in the vehicle, and asked whether he still wanted the "sets". The agent responded affirmatively and Henderson quoted the cost of one hundred dollars. The agent paid the money to Henderson. In turn, Henderson pulled out a small manila envelope from his coat pocket and counted ten tablets. Henderson gave them to McGavits to give to the agent since he was sitting between the two. Henderson pulled out another envelope and counted twenty white tablets, gave them to McGavits who gave them to the agent.

While everyone was still in the vehicle, but after the sale had transpired, the defendant, "... turned around in the front seat, faced [the agent] and requested that [the agent] give him something for arranging the deal." The defendant indicated that he wanted drugs, e.g., half a "set", and the agent refused. Instead, the agent gave the defendant ten dollars in "official" funds by placing it "on the car seat". After the agent had exited the vehicle, the defendant walked up to him and remarked, "... it was a pretty good deal purchasing the ten sets for a hundred dollars...." The agent did not agree and departed to have the tablets tested. The results showed that they were controlled substances.

At the conclusion of the Commonwealth's case, the defendant's motion to dismiss (demurrer) was denied.

The defendant took the stand in his own defense and contradicted the agents' accounting of what transpired on the days in question, e.g., (as to No. 1521 of 1983), it was Marla who conducted the purchase of pills from Gowdy and the defendant never received anything from Gowdy as he (Gowdy) stood outside the vehicle; (as for No. 1651 of 1983), it was Marla who spoke to Henderson, and the agent and Henderson struck a deal between themselves without the defendant's help. He also denied ever asking for any drugs or money from Agent Shoup in payment for setting up the sale/purchase.

The trial court, after listening to all the evidence, found the defendant guilty as charged. However, with the filing of a post-verdict motion seeking a new trial or arrest of judgment, the trial court altered its ruling. In an opinion filed on April 9, 1986, the trial court believed it had erred in entering the verdict it did at No. 1521 of 1983 because there were "insufficient facts to establish either that a delivery was made by the defendant or that a conspiracy was consummated between the defendant and Gowdy." Thus, "upon careful reflection, th[e] Court conclude[d] that all the Commonwealth ha[d] established ... [was] that the defendant possessed a number of white pills." (Trial Court Opinion at 3)

As for the charges listed at Information No. 1651 of 1983, the trial court, "upon careful reflection and reconsideration of the facts", concluded that the delivery had been proven, but the conspiracy between the defendant and Henderson was lacking in proof. Id. at 6. As a result, by orders dated April 9, 1986, the defendant's motion in arrest of judgment with regard to the delivery and conspiracy convictions at No. 1521 of 1983 was granted; whereas, only the conspiracy charge at No. 1651 of 1983 was found wanting and arrested. The delivery conviction was left standing. This appeal followed by the Commonwealth and is properly before us since it raises a question of law in regard to the trial court's orders arresting judgment. See *Commonwealth v. Melton,* 402 Pa. 628, 168 A.2d 328 (1961).

The Commonwealth raises, in essence, a single challenge to the trial court's grant of the defendant's motion in arrest of judgment for engaging in a "re-evaluation of the sufficiency of the evidence." Notwithstanding the trial court's submission of a supplemental post-verdict opinion arguing to the contrary, we find that the facts and the reasonable inferences to be drawn therefrom were sufficient to sustain the charges lodged against the defendant.

The trial court's grant of Lanager's motion in arrest of judgment was based on the ground that "the evidence presented by the Commonwealth at the time of trial was

insufficient to establish the elements necessary to sustain the[ ] verdicts of guilt." (See Trial Court's "Additional Opinion" at 2) In assessing that conclusion, we must determine whether:

> The case is sufficient for a jury to find guilt "unless the proof relied upon for a conviction is so weak and inconclusive that as a matter of law no probability of fact can be drawn from the combined circumstances," *Commonwealth v. DePetro*, 350 Pa. 567, 578, 39 A.2d 838 (1944). Restated, the test requires, before the granting of a motion in arrest of judgment based on insufficiency of the evidence, that the court make a finding that the evidence supporting the verdict of guilt is so weak and inconclusive that a jury of reasonable men and women could not be satisfied as to the guilt of the defendant beyond a reasonable doubt.

*Commonwealth v. Blevins*, 453 Pa. 481, 487, 309 A.2d 421, 424–25 (1973).

We find that the evidence establishes, with regard to February 3, 1983, that the defendant was asked and agreed to secure drugs for Agents Shoup and Mohn. His efforts to do so took the form of engaging an individual (Gowdy) in conversation outside of "Good Cook's" bar. This led to Gowdy entering Marla's vehicle and, shortly thereafter, Marla asking the agents for money ($30) to make a purchase.

The agents were corroborative in stating that Gowdy proceeded to exit Marla's vehicle and dispensed a quantity of pills out of two bottles and passed them through the passenger window where the defendant sat. When Gowdy left, Agent Shoup walked to where the defendant was seated in the vehicle and saw him in possession of white tablets and being told by the defendant that he was able to obtain what the agents wanted. The distribution was made by Marla to the agents.

■ It must be remembered that a conspiracy can be inferentially established by showing the relation, conduct or circumstances of the parties, and the overt acts on the part

of the co-conspirators have uniformly been held competent to prove that a corrupt confederation has in fact been formed. *Commonwealth v. Horvath,* 187 Pa.Super. 206, 211, 144 A.2d 489, 492 (1958).

■ Instantly, we have *direct* proof of the defendant (1) agreeing to aid in the procurement of drugs and (2) being in possession of drugs shortly after they were seen being dispensed out of bottles by a dealer to the defendant.

A trier-of-fact, in our mind, would be eminently authorized in making a reasonable inference from the evidence presented that the defendant conspired with one Hardy Ray Gowdy to deliver a controlled substance for currency in violation of The Controlled Substance, Drug, Device and Cosmetic Act. 35 P.S. § 780–101 et seq. See *Commonwealth v. Ferguson,* 358 Pa.Super. 98, 516 A.2d 1200 (1986).

The defendant was not an innocent bystander caught in the middle of a drug transaction. Rather, he was an active partner in the effectuation of the sale and purchase. Without the defendant's participation in eliciting Gowdy's aid in providing the controlled substances, the transaction would never have materialized, let alone been completed. See *Commonwealth v. Minnich,* 236 Pa.Super. 285, 344 A.2d 525 (1975). Further, the fact that Marla may have been the conduit for the actual "delivery" of the drugs to the agents does not insulate the defendant from accountability, since "delivery" can be actual or constructive to be violative of the Act. 35 P.S. § 780–102. Here, the defendant was seen being handed the drugs and merely had Marla complete the transfer to the agents. His liability is no less extant because of Marla's involvement. See *Commonwealth v. Padilla,* 65 Lancaster L.Rev. 167, 168 (1975).

■ To the same extent, we have no reservation in finding the defendant culpable of conspiring with one Henderson, on February 11, 1983, to deliver controlled substances to Agent Shoup in violation of the Act.

The defendant was again the instrument by which the agent was able to purchase the prohibited drugs. The defendant was informed of the agent's wishes and consented to be a party to bring those wishes to fruition.

The defendant personally engaged Henderson in a discussion, and when the agent attempted to intervene the defendant advised him that he would handle the entire matter. The result of this exchange between the defendant and Henderson led the latter to acquire the quantity (ten sets) desired by Agent Shoup at a price stated ($100). These two facts were communicated solely to the defendant by the agent earlier that day at his residence. One could reasonably infer from these given facts that there would had to have been an interchange of information between the defendant and Henderson for the dealer to have produced the specific amount sought and for the fixed price known only to the defendant and the agent.

Albeit the money and drugs were exchanged in the back of Marla's vehicle without passing through the defendant's hands, he voiced his demand for some form of remuneration for setting up the deal. The agent at first refused, but later conceded and left ten dollars on the front seat of the vehicle where the defendant sat.

Are these the remarks of one, who, by happenstance, was present during the consummation of a drug deal not brought about through his efforts? We think not. Compare *Commonwealth v. Derr*, 501 Pa. 446, 462 A.2d 208 (1983); *Commonwealth v. Evangelista*, 8 D. & C.3d 566 (Franklin County 1978). The defendant was the force behind the dealings, and in the second instance he oversaw the actual sale and then sought recompense for his orchestration of the entire affair.

As has been stated so often in this jurisdiction, in the course of a conspiracy each participant is accountable for the acts of the other, provided, of course, that they are in furtherance of the conspiracy. See *Commonwealth v. Robinson*, 351 Pa.Super. 309, 505 A.2d 997 (1986).

■ We can find nothing in the facts that would alter our decision that the trial court (despite its statements to the contrary in its "Additional Opinion" to us) engaged in a factual redetermination by converting guilty verdicts into not guilty verdicts; a practice not condoned by this Court. See *Commonwealth v. Gaither*, 355 Pa.Super. 502, 513 A.2d 1034 (1986); *Commonwealth v. Parker*, 305 Pa.Super. 516, 451 A.2d 767 (1982).

This position is buttressed from our review of the entire record, which showed a defendant's recollection being in stark contrast to the agents' accounting of what transpired on the days in question. Therefore, credibility determinations were initially made to believe the agents over the defendant. With the reversal of the verdicts, the trial court, of necessity, would have had to re-evaluate the agents' testimony to favor the defendant, since our review of the facts in a light most favorable to the verdict-winner, the Commonwealth, is supportive of the original decision.

We do not approve of such a reconsideration when the facts warrant an affirmance of the judgment of sentence. Truly, the evidence was not so weak and inconclusive as to justify an arrest of judgment, not to mention a re-assessment of the facts, which was admitted by the trial court at page 6 of its opinion wherein it wrote that it engaged in a "reconsideration of the facts" in reaching its decision.

Generally, in light of our reversal of the trial court's arrest of judgment, we would remand for a determination of the defendant's post-verdict motion seeking a new trial. Instantly, however, the reasons assigned therein lack merit, e.g., that the verdict was contrary to the weight of the evidence.[2] As our recitation of the facts discloses, a new trial is not needed for any of the reasons proffered by the accused. See *Robinson*, supra.

Orders of the trial court arresting judgment are reversed

**2.** The defendant raised two additional issues which were properly disposed of in the opinion of the trial court dated April 9, 1986.

and the case is remanded for the imposition of sentence.[3] Jurisdiction is relinquished.

ROWLEY, J., concurs in the result.

---

**3.** We would note that the trial court's denial of the defendant's post-verdict motion with respect to the delivery conviction at No. 1651 of 1983 is not questioned by the defendant on appeal. Thus, the sentence imposed with regard thereto is not before us for review.