623 A.2d 859

COMMONWEALTH of Pennsylvania, Appellee,

v.

Betty IMES, Appellant,

COMMONWEALTH of Pennsylvania, Appellee,

v.

Patrick IMES, Appellant.

Superior Court of Pennsylvania.

Submitted March 8, 1993.

Filed April 23, 1993.

Byron M. Yatron, Boyertown, for appellants.

Stuart B. Suss, Asst. Dist. Atty., West Chester, for Com., appellee.

Before CIRILLO, HUDOCK and BROSKY, JJ.

HUDOCK, Judge:

This is an appeal from the judgments of sentence entered in these consolidated cases against Appellants Betty and Patrick Imes. Both Betty and Patrick (mother and son) were convicted in a non-jury trial of theft by deception [1] for their participation in, and ownership of, two carnival games. Post trial motions were filed and denied. Patrick was sentenced to one year probation and a $500 fine. Betty was sentenced to one year probation and a $300 fine. These appeals followed and were consolidated by stipulation. We reverse.

The facts which led to the arrest of Appellants involved a carnival which was being sponsored by the Downingtown Chamber of Commerce at Kerr Park in the Borough of Downingtown, Chester County. Patrick, Betty, and two other family members own Oscar Amusements, Inc., which provided the rides and arranged for the game booths. Patrick personally owns the milk bottle game involved in this action; Betty owns the milk can game also involved here. The trial court summarized the other pertinent facts of this case as follows:

On July 28, 1990, Trooper Richard M. O'Brien of the Pennsylvania State Police Barracks was directed to go to the carnival sponsored by the Downingtown Chamber of Commerce at Kerr Park in the Borough of Downingtown,

1.  18 Pa.C.S. § 3922.

Chester County, and while there observed two games, a milk bottle game and a milk can game.

The milk bottle game consisted of three white milk bottles. The object of the game was to knock all the bottles down. The cost was one dollar per game, and on this occasion Trooper O'Brien played this game twice. He further observed 18 to 20 people playing the game and observed no winners. The bottles were stacked with two on the bottom and one on the top, and there appeared to be no difference in the bottles to an observer.

The milk can game consisted of the standard milk cans, and the object was to toss a softball into the can. The cost was one dollar ($1.00) per game. Trooper O'Brien played this game with no success, and observed at least a dozen people attempt to win the stuffed toy animals, and observed no winners.

Trooper O'Brien also observed the balls strike the center of the can and bounce back on several occasions.

Corporal Ramos of the Pennsylvania State Police, Embreeville Barracks, also was detailed to observe these games. Trooper Ramos played and participated in the milk can game, and he, likewise, had no success, and he observed one dozen to two dozen people play, and also observed the ball bounce out of the center of the can a number of times.

Trooper Ramos also observed the milk bottle game and observed at least two dozen persons participate in this game, and did not observe anyone knock the three bottles down at the same time.

The officers convened to determine what they had observed from these two games along with other troopers who were situated in the park, and who also participated in these games. They concluded that they would shut down the two games. Trooper O'Brien went to the milk bottle game and identified himself as a Pennsylvania State Trooper to a Mr. Bowman, and indicated to him that he wanted to inspect the game.

Upon the inspection of the milk bottles, the trooper clearly noted the difference in weight of two of the three

bottles, and those two were situated on the bottom row of the two-tier setup. Upon observing this difference in weight, Trooper O'Brien indicated that the game would be shut down, and at that time one Patrick Imes approached the trooper and indicated that he was the operator of the game.

Prior to the group of troopers meeting to converse, Trooper Ramos had stepped back from the milk can game to stand on a slight hill, or incline, and observed from his view that the milk can contained a metal ring inside of the can neck.

Trooper Ramos then approached the milk can game to inspect that game and observed Josh Painter and Joseph Imes behind the setup with aprons on, and made them aware at that time that he wanted to inspect the game, and the game was shut down.

At the time of the participation of Trooper Ramos in the actual games earlier that evening, he observed Betty Imes standing behind the counter wearing an apron and operating this game.

At the time of Trooper Ramos' participation in the game, the only signs that were visible were signs that indicated, "one in, you win". There were approximately four signs in and around this particular trailer area where this game was located.

At trial, the cans and bottles were accepted into evidence and this Court noted that some of the bottles [3] were weighted and observed the inner ring structure of the cans.[4]

---

[3] The games were bought from an Allentown, Pennsylvania, toy company, but the bottles were purchased unweighted and Defendant had them weighted. (N.T., 6/24/92, p. 149). Trooper O'Brien testified that while the milk bottles appeared to be identical, and there were not [sic] signs that indicated otherwise, the bottle on top weighed one pound, while the two on the bottom weighed 12 pounds. (N.T. 6/23/91, 11:15 a.m. session, pp. 6, 11).

[4] In addition to this Court's observation of the cans, Corporal Ramos testified at trial that based on training in carnival investigation, in order for the milk can game to be fair the needed to be a 30 inch clearance above the can and the opening [of] the can must be the width of the ball plus ¾ of an inch. He further testified that neither of these

requirements were present in the defendants' games. (N.T. 6/23/91, 2:00 p.m. session, pp. 19, 20).

Trial Court Opinion at pp. 1–4. (Footnote 2 omitted.)

Appellants raise the following issues in their appeal:

I. ARREST OF JUDGMENT.

 A. Was the Commonwealth's evidence insufficient as a matter of law because the Commonwealth failed to prove the elements of the creation or reinforcement of a false impression.

 B. Must the Defendants be granted an arrest of Judgment because the Crimes Code and the Theft by Deception statute have no application to carnival games and/or to the conduct of the Defendants in this matter.

II. NEW TRIAL.

 C. Must the Defendant's [sic] be granted a new trial due to the introduction of evidence resulting from a warrantless and illegal search and seizure.

 D. Must [the] conviction of Betty Imes be reversed because it is against the weight of evidence which indicates that Betty Imes was not operating the milk can game.

 E. Must the convictions for Theft by Deception be reversed because there exists an innocent explanation for the conduct for which the crime was charged.

Appellants' Brief at p. 3.

We note initially that Appellants' issue E has been waived for failure to raise it in their 1925(b) statement. Pa.R.A.P. 1925(b).

In reviewing a motion in arrest of judgment, we must determine whether the Commonwealth's evidence was legally sufficient to support the verdict. Where the evidence is insufficient to establish guilt beyond a reasonable doubt as to the crimes charged, the motion is properly granted. The standard is the same whether a finder of fact was a jury or a judge sitting without a jury. *Commonwealth v. Robinson*, 351 Pa.Super. 309, 311–12, 505 A.2d 997, 998 (1986). In reviewing the evidence to determine whether it is legally sufficient, we must examine the evidence in the light most favorable to the

Commonwealth as verdict winner and, in light of this and the permissible inferences which may be drawn therefrom, whether all of the elements of the crime have been established beyond a reasonable doubt. *Commonwealth v. Griscavage*, 512 Pa. 540, 543, 517 A.2d 1256, 1257 (1986).

Appellants were charged with the crime of theft by deception which reads in pertinent part:

(a) **Offense defined.**—A person is guilty of theft if he intentionally obtains or withholds property of another by deception. A person deceives if he intentionally:

(1) creates or reinforces a false impression, including false impressions as to law, value, intention or other state of mind; but deception as to a person's intention to perform a promise shall not be inferred from the fact alone that he did not subsequently perform the promise[.]

18 Pa.C.S. § 3922(a)(1).

The Commonwealth argues that Appellants created a false impression that the two games were easier to win than they in fact were. The Commonwealth argues that because the milk bottles looked alike, people who would come to play the game would assume they were alike in all respects including their weight. Likewise, the Commonwealth argues that the milk can looked like an ordinary milk can, and because the can was positioned so that people could generally not see the opening of the can, people would assume that the opening was, in fact, the same size as the outside dimensions suggested, rather than substantially smaller as a result of a metal ring having been welded to the inside of the mouth of the can. The Commonwealth relied upon the observations of the state police officers in assessing the impact the games had upon those who played both games.

In response to the Commonwealth's argument, Appellants assert that they created no false impression because they carefully designed the games to reflect a winning percentage which would enable them to make a profit. They argue that the prizes they award to a winner have a value between $25 and $35; therefore, the games must be sufficiently difficult to win in order to create the profit margin they placed on the

games. They argue that merely making the game more difficult than it first appears is not sufficient alone to create a false impression. Furthermore, Appellants argue that the Commonwealth failed to prove that anyone was, in fact, deceived by the manner in which the games were conducted. We find this last argument of Appellants to be persuasive.

█ We held in *Commonwealth v. Linder*, 284 Pa.Super. 327, 334, 425 A.2d 1126, 1129–30 (1981):

> Section 3922 of the Crimes Code clearly gives a person of ordinary intelligence notice that it is unlawful for that person to intentionally create a false impression in the mind of another and then *use the other person's reliance on the false impression* to obtain someone else's property. This statute does not penalize a person for what is in his mind, as appellant argues, but rather it punishes a person for his actions in creating the false impression and thereby obtaining another's property.

(Emphasis added.) Therefore, the Commonwealth must establish not only the presence of a false impression, but the reliance upon that impression by the victim. *See also Commonwealth v. Johnson*, 312 Pa. 140, 167 A. 344 (1933) (the crime of attempted false pretenses, now theft by deception, does not require that the victim be deceived, however, the completed offense does) and *Commonwealth v. Mitchell*, 234 Pa.Super. 21, 335 A.2d 521 (1975) (both cases under former false pretense crime). Therefore, the state of mind of the victim must be established in order to satisfy the element of "creating" or "reinforcing" the false impression.

█ At trial, the Commonwealth presented evidence that several state police officers played the two games, and observed other unnamed people play the games, all without success. We find, however, that none of the unnamed people were called to testify at the trial. Consequently, none of them could state whether they relied on a false impression which might have been created by Appellants.[2] Furthermore, the

---

2. We do not decide whether the manner in which these games were conducted does create a false impression. We leave that issue to be

state police officers who played the games were sent to the carnival by their supervising officer to investigate the two games as potentially fraudulent. The following exchange took place while Appellants' counsel was cross-examining one of the state police officers:

Q: In fact, were you deceived?

A [Paul Ramos]: I was not deceived because I am an investigator, and I don't believe I can be deceived.

N.T. 6/23/91 at p. 36. There was no testimony by the other officers that they had been deceived. All who testified agreed that they were investigating these two games at the request of their supervisor. It is apparent from this evidence that the Commonwealth failed to present any evidence that a victim had been deceived, and, therefore, gave up property in reliance upon any representation. As a result, we find that the Commonwealth failed to prove, beyond a reasonable doubt, reliance on a false impression, which is a necessary element of the crime of theft by deception. Therefore, we reverse the convictions of Appellants and direct that the charges be dismissed. Because of our disposition of this issue, we do not need to address the other issues raised in Appellants' brief.

Judgments of sentence reversed. Jurisdiction relinquished.

decided another day because its resolution is not necessary to our disposition of this appeal.