582 A.2d 1078

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Ernest EDWARDS, Appellant.**

Superior Court of Pennsylvania.

Argued Feb. 13, 1990.

Filed Nov. 13, 1990.

Reargument Denied Jan. 3, 1990.

546

548

550

Gilbert B. Abramson, Philadelphia, for appellant.

Frances G. Gerson, Asst. Dist. Atty., Philadelphia, for Com., appellee.

Before CAVANAUGH, OLSZEWSKI and FORD ELLIOTT, JJ.

CAVANAUGH, Judge:

Appellant, Ernest Edwards, Jr., was convicted by a jury on eight criminal informations arising out of his activity in the Osage Avenue Redevelopment Project in the City of Philadelphia.[1] Following the denial of post-trial motions, appellant was sentenced to an aggregate of six to twelve years imprisonment and ordered to pay restitution of $137,-000.00.

The factual history of the case is summarized in the trial court's opinion as follows:

On May 13, 1985, in an effort to remove the radical group known as MOVE from 6221 Osage Avenue, the house was fire bombed, causing a holocaust, killing eleven people and completely destroying sixty-one homes. Immediately thereafter, the City Administrators promised reparations: to rebuild the homes and to return the displaced residents to their homes by the end of the year. To this end, the City, which was to provide the necessary construction monies, enlisted the City of Philadelphia Redevelopment Authority (hereinafter "RDA") to acquire the title to the site, prepare a prototype home and select a developer and the Urban Local Development Corporation (hereinafter "ULDC") to disburse the 6.7 million dollars the City had allotted for the Restoration. In late June,

---

**1.** Ernest Edwards was tried along with William Harris, who was also convicted on several of the charges lodged against him. Harris' conviction was affirmed by this court at No. 3410 Philadelphia 1988 on April 10, 1990.

the RDA awarded the construction contract to the developer, Edwards and Harper, Inc. (hereinafter "E & H"), a close corporation in which defendant was one of two principals and which had been specifically incorporated to develop the Osage Project, obligating it to procure a completion bond, hire a general contractor and complete the project in accordance with prototypes prepared by the RDA. E & H would be reimbursed on a percentage-of-work-completed basis on a predetermined line item cost breakdown. Soon after the award, defendant Edwards proceeded on his undertaking. He enlisted the cooperation of Ebony Construction Company, Inc., (hereinafter "Ebony"), a New Jersey corporation, of which defendant Harris was the principal proprietor and defendant Edwards was director, as general contractor. Defendant Edwards requested and received start-up money for the Osage Project and commenced work on July 1, 1985, before obtaining the completion bond. When Ebony proved unbondable, defendant formed Premier Construction Company Incorporated (hereinafter "Premier") to serve as general contractor. Unsuccessful in having Premier bonded, on September 9, Premier relinquished its position as general contractor to G & V General Contractors (hereinafter "G & V"), which was able to procure bonding, relegating Premier to subcontractor status. On February 10, 1986, both of defendant's companies (E & H and Premier) were defaulted, leaving G & V, the general contractor, to complete the job, encumbered with over one million dollars of unpaid costs.

Trial Court Opinion 7/10/89 at pages 2–4.

The initial discussion will deal with three separate incidents of alleged theft involving appellant. The Commonwealth has attached to each incident three theft-related labels: Theft by Deception (18 Pa.C.S. § 3922), Theft by Failure to Make Required Disposition (18 Pa.C.S. § 3927) and Misapplication of Entrusted Property (18 Pa.C.S. § 4113). Bills Nos. 3390, 3378 and 3388 allege that, after being advanced $202,400.00 for the mobilization of the

Project, appellant misappropriated $91,585.41 to his own use. Bills Nos. 3392, 3379 and 3384 allege that appellant double-dipped on transportation expenses in the amount of $4,800.00. Bills Nos. 3391, 3380 and 3383 allege that, after shifting money around from bank account to bank account, appellant mysteriously became $11,300.00 richer. Appellant argues that the evidence presented at trial was insufficient to convict him of these three theft charges and that the verdicts were against the weight of the evidence.

The test for determining the sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the Commonwealth, and drawing all proper inferences favorable to the Commonwealth, the jury could reasonably have determined all elements of the crime to have been established beyond a reasonable doubt. *Commonwealth v. Aulisio,* 514 Pa. 84, 522 A.2d 1075 (1987). For a new trial to lie on a challenge that the verdict is against the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court. *Commonwealth v. Reardon,* 374 Pa.Super. 212, 542 A.2d 572 (1988). In addition, where the evidence is legally sufficient, it generally meets the test for weightiness. *See Commonwealth v. Robinson,* 351 Pa.Super. 309, 505 A.2d 997 (1986).[2]

With these principals in mind we look to the evidence upon which the jury based its conviction of appellant on the various offenses.

2. We note that it has been questioned whether appellate courts in this Commonwealth are still able to review the verdict to determine if it is against the weight of the evidence. *See Commonwealth v. Nelson,* 514 Pa. 262, 271–72 n. 3, 523 A.2d 728, 733 n. 3 (1987); *see also, Commonwealth v. Wallace,* 522 Pa. 297, 315, 561 A.2d 719, 728 (1989). In light of the fact that this verdict is supportable under the traditional standard, which states that a verdict cannot stand if it is so contrary to the weight of the evidence as to shock one's sense of justice, *Commonwealth v. Gamber,* 352 Pa.Super. 36, 45, 506 A.2d 1324, 1329 (1986), we need not rule specifically on whether this claim is cognizable.. However, we note our recent decision in *Commonwealth v. Jenkins,* 578 A.2d 960, (1990), that though the practice is limited, a properly raised weight of the evidence issue shall not be denied this court's review.

## THEFT BY DECEPTION

[2] Bill No. 3390 charges Edwards with theft by deception of $91,585.41 in connection with the utilization of the mobilization funds paid to E & H by ULDC. 18 Pa.C.S. § 3922 provides:

(a) **Offense defined.**—A person is guilty of theft if he intentionally obtains or withholds property of another by deception. A person deceives if he intentionally:

(1) creates or reinforces a false impression, including false impressions as to law, value, intention or other state of mind; but deception as to a person's intention to perform a promise shall not be inferred from the fact alone that he did not subsequently perform the promise;

(2) prevents another from acquiring information which would affect his judgement of a transaction; or

(3) fails to correct a false impression which the deceiver previously created or reinforced, or which the deceiver knows to be influencing another to whom he stands in a fiduciary or confidential relationship.

(b) **Exception.**—The term "deceive" does not, however, include falsity as to matters having no pecuniary significance, or puffing by statements unlikely to deceive ordinary persons in the group addressed.

After having been selected as the developer on the Osage Project, appellant requested start-up money before the formal signing of the contracts and before the actual construction commenced. ULDC had earmarked one million dollars for the mobilization of the project and Joseph Gaudit, ULDC's on-site representative, discussed with appellant the items that would be eligible for payment out of that fund. On June 26, 1985, appellant Edwards made his first formal request for $340,000, an amount which was refused because it contained construction costs and construction had not yet begun. A second request for $212,400.00 was also rejected because it contained an improper item for developer's fees, an expense not allowable at that time. After appellant's third application for funds, ULDC paid E & H $202,400.00 based on the following line items: project personnel, trailer

rental, office furniture, equipment and supplies, telephone and utility deposits, layout and survey, insurance, labor, security and fencing, community liaison, equipment rental and legal, architectural and engineering fees. A promissory note was signed by the principals of E & H, appellant Edwards and Beverly Harper. At appellant's suggestion that some of these items were costs incurred by the general contractor, $108,400.00 was transferred to Ebony's account which had been specifically opened for receiving mobilization monies. Withdrawals from this account required appellant's signature. On the very same day of the transfer, a rash of checks were drawn on this Ebony account: $14,000.00 to appellant Edwards, $2,250.00 to cash (endorsed by appellant), $15,000.00 to Ebony which was deposited in another Ebony account, and approximately $80,000.00 to a host of suppliers for goods which had been provided to Ebony long before the Osage disaster.

Appellant argues that this conduct does not constitute theft by deception. He contends that he made no promise nor stated any intent to use the disbursed money specifically for the purposes outlined in his application. Appellant considered his application to be nothing more than a partial list of categories and estimates which were not binding on E & H. In his view, once ULDC disbursed the money to E & H, it became the property of E & H and could be used in any way the corporation saw fit. The $202,400.00 should be seen as money advanced to "finance" E & H and Ebony, and paying off old creditors and taking some pocket money were forms of "financing."

The evidence showed that E & H was a redevelopment corporation created for the sole purpose of enabling the City of Philadelphia to rebuild Osage Avenue. ULDC agreed to front the money for the mobilization of the Project in order to allow E & H to begin work immediately, without having to procure private financing.[3] It was rea-

---

**3.** Payment of mobilization costs in advance is not the usual procedure. Normally on a construction project, mobilization occurs and the cost is reimbursed to the contractor.

sonable for ULDC, relying on appellant's submitted application, to assume that appellant would use the money in accordance with the terms spelled out in his application. Appellant was aware of the importance of the application because his first two attempts to obtain funding were rejected because of inaccurate proposals.

ULDC's representative, Joseph Gaudit, testified that no money would have been disbursed if appellant had alerted ULDC that he was going to use the mobilization money to pay old Ebony debts. As it turned out, not one of the checks drawn against the mobilization money deposited in the Ebony account was in payment for expenses related to the mobilization of the Project. We conclude that there was sufficient evidence for the jury to find that appellant obtained the mobilization funds by intentionally creating a false impression which deceived ULDC into believing that the disbursed money would be used for mobilization when, in fact, he intended to use the money to pay old Ebony debts.

Appellant was convicted, in Bill No. 3392, of theft by deception of $4,800.00 worth of transportation expenses. The evidence showed that Beverly Harper agreed that E & H would pay appellant transportation expenses of $800.00 for the monthly payments on a 1985 Jaguar that Edwards was leasing for his use. Appellant received and cashed four E & H checks totaling $4,800.00, purporting to be transportation expense reimbursements. However, payments on the lease of the Jaguar were actually being made from checks drawn on Ebony's account. Appellant admitted receiving the checks and not spending the money on transportation expenses.

Appellant argues that, since the information lists ULDC as the owner of the stolen property, he cannot be convicted because he was paid the $4,800.00 by E & H. Appellant ignores the fact that E & H obtained the money from ULDC through appellant's deception. Since the money which E & H controlled had been fraudulently obtained from ULDC, every time appellant converted that money to

his own use he was effecting an unlawful taking. In short, appellant joined his unlawful taking of the funds with his ongoing deception of ULDC and thereby committed theft by deception.

■ Appellant was convicted, in Bill No. 3391, of theft by deception in connection with $11,300.00 which was paid to him by Premier. The evidence showed that, at appellant's request, E & H loaned him $175,000.00. Appellant then placed this money in Premier's account to create the illusion that Premier was liquid. The following day $150,000.00 was repaid to E & H, with the remaining $25,000.00 remaining in Premier's account. From this remaining sum, Premier paid out $11,300.00 to appellant.

Appellant argues that this evidence is insufficient to convict him of theft by deception. He contends that the money belonged to Premier and that there was no evidence presented to show that he obtained it from Premier through fraudulent means. Appellant ignores the fact that he was Premier and that he obtained the $175,000.00 from E & H by misrepresenting to Beverly Harper that he would immediately repay the loan on the following day, knowing full well that he had no such intention. Appellant's deception, in fact, was an ongoing scheme to unlawfully pocket ULDC's money. Changing checking accounts did not launder the illegally gotten funds.

Appellant also renews his argument that the money in question belonged to Premier and it was free to use it in any way it saw fit. He erroneously contends that ULDC no longer had any interest in the money once it was given to E & H. Appellant is incorrect. The money appellant received from Premier was money Premier obtained from E & H which in turn, was money E & H had received from ULDC, an acquisition made possible by appellant's initial deception. Premier's payment of this ill-gotten money to appellant is only another link in the chain of deception and completes another unlawful taking. The evidence showed that E & H, Ebony and Premier were corporations which appellant con-

trolled and used to illegally pocket ULDC's money. It was sufficient to support the conviction of theft by deception.

## THEFT BY FAILURE TO MAKE
## REQUIRED DISPOSITION

■ Appellant next argues that the evidence was insufficient in regard to his convictions of theft by failure to make required dispositions. We are still considering the three incidents discussed above, but analyzing them in relation to another theft statute. This particular statute reads as follows:

§ 3927. **Theft by Failure to Make Required Disposition of Funds Received.**

(a) **Offense defined.**—A person who obtains property upon agreement, or subject to a known legal obligation, to make specified payments or other disposition, whether from such property or its proceeds or from his own property to be reserved in equivalent amount, is guilty of theft if he intentionally deals with the property obtained as his own and fails to make the required payment or disposition. The foregoing applies notwithstanding that it may be impossible to identify particular property as belonging to the victim at the time of the failure of the actor to make the required payment or disposition.

In *Commonwealth v. Crafton*, 240 Pa.Super. 12, 16, 367 A.2d 1092, 1094 (1976), this court outlined the four elements of the crime of theft by failure to make required disposition:

1. the obtaining of property of another;
2. subject to an agreement of known legal obligation upon the recipient to make specified payments or other disposition thereof;
3. intentional dealing with the property obtained as the defendant's own; and
4. failure to make the required disposition of the property.

The Commonwealth contends that appellant obtained the property of ULDC ($202,400.00), subject to an agreement,

(as expressed in his application) to use the money for the mobilization of the Osage Avenue Redevelopment Project. He then converted portions of the money to his own use and thereby failed to make the required disposition of the property.

Appellant argues that the $202,400.00 was an advance payment on a construction contract with title and ownership of the money passing to E & H. Therefore, he was not dealing with the property of ULDC. In addition, he did not receive the money subject to any agreement to make specified payments. His application request for funds was only a non-binding list of construction categories and estimates. To bolster his position, appellant cites *Commonwealth v. Austin*, 258 Pa.Super. 461, 393 A.2d 36 (1978), wherein this court reversed a conviction for theft by failure to make lawful disposition of funds received. We find *Austin* clearly distinguishable.

In the *Austin* case, a contractor received advance money for the purchase of materials on a construction contract. Austin performed for two months when he realized that he had under-estimated the job. Having run out of money, he stopped work. Although some of the advance money was not spent on materials, the evidence showed that all the money was spent in a manner which could be construed to have been necessary for the completion of the project.

Austin's conviction was reversed because (1) he had not *fraudulently* obtained the advance money; (2) the construction contract was not an agreement which compelled Austin to use the money *only* for the purchase of materials; (3) the money was otherwise spent in furtherance of the proposed project; and (4) the failure to complete the job was not due to Austin's converting the money to his personal use.

In the instant case, the evidence showed that Ernest Edwards obtained the $202,400.00 from ULDC by convincing the agency that he would use the money to mobilize the Osage Project. Appellant submitted several applications for mobilization funds until ULDC finally agreed that the specifications proposed by appellant satisfied its require-

ments for the loan. Thus, appellant obtained the property of another subject to an agreement that it would be used in the mobilization effort.[4] The money appellant received was property in which ULDC had an interest which appellant was not privileged to infringe. This loan agreement encompassed more than a mere promise by appellant to repay the money, as may be the case in a creditor-debtor relationship. In fact it is appellant himself who provides a correct interpretation of the agreement: "To the contrary, the only agreement or known legal obligation concerning the disposition of the mobilization loan proceeds, if any, supported by the evidence, *is an agreement to apply the proceeds to the payment of all necessary mobilization expenses.*" (Emphasis added). Appellant's brief at page 23.

Therefore, when appellant intentionally converted some of the proceeds of the loan to his own use by paying off old debts (Bill No. 3378), double dipping on the transportation expenses (Bill No. 3398), and pocketing the money from Premier (Bill No. 3380), he committed a theft by failing to make the legally required disposition of the funds.

## MISAPPLICATION OF ENTRUSTED PROPERTY

Appellant was also convicted on the same evidence of the misapplication of entrusted property with respect to mobilization funds ($91,585.41), the falsified transportation expenses ($4,800.00) and the Premier capitalization scheme ($11,300.00). Appellant's contention that the evidence was insufficient to support these convictions is without merit.

The statute in question reads as follows:

§ 4113. **Misapplication of Entrusted Property and Property of Government or Financial Institutions.**

(a) **Offense defined.**—A person commits an offense if he applies or disposes of property that has been entrusted to him as a fiduciary, or property of the government or of a financial institution, in a manner which he knows is unlawful and involves substantial risk of loss or detri-

---

**4.** 18 Pa.C.S. § 3901 Definitions. "Property of another" includes property in which any person other than the actor has an interest which the actor is not privileged to infringe....

ment to the owner of the property or to a person for whose benefit the property was entrusted.

█ The statute applies to misappropriation of three separate types of property: property belonging to the government, property belonging to a financial institution, and property entrusted to a fiduciary. An individual who misapplies any of the property as set forth above violates the statute. This construction gives effect to all of the phrases in § 4113(a).

█ Appellant was a fiduciary for purposes of statute. He had received funds for a stipulated purpose and was obligated to apply the money to that purpose. A fiduciary is defined as: "An executor, administrator, guardian, committee, receiver, trustee, assignee for the benefit of creditors, and *any other person acting in any similar capacity.*" 1 Pa.C.S.A. § 1991. Appellant had been advanced the monies for the specific purpose of mobilizing the project, and he was a fiduciary for purposes of § 4113. E & H only received the advance after the third application, itemizing how the funds would be spent, was approved, and a duty of faithfully carrying out this obligation was imposed.

## REMAINING COUNTS

Appellant was convicted of perjury (No. 2786) and false swearing (Bill No. 0190) in connection with the testimony which he gave to the County Investigating Grand Jury on October 18, 1985. This Grand Jury had been impaneled to investigate allegations of bribery, theft and fraud in connection with the Osage Project. The factual basis for the charges is as follows:

Louis Dolente, III, partner in Dolente & Sons, one of the subcontractors engaged in sewer construction work, provides the testimony that resulted in defendant's conviction on one of the numerous counts of theft. He testified that he was approached by Edwards to submit a bid on storm sewer work not originally included in the contract. Shortly thereafter, when he advised Edwards he could complete the job for $19,000.00, Edwards in-

formed him that the other bids were in the area of $28,000.00 and if Dolente put in such a bid, the two of them could split the $9,000.00 difference. N.T., 5/6/88, pp. 63–70. Simultaneously with his completion of the work, Dolente submitted his bid in the amount of $28,-464.00 to Edwards. G & V paid Dolente & Sons a total of $27,040.00 on December 3, 1985. To cover up the misdeed, on December 10, Edwards presented to Dolente a letter in lieu of an invoice, requesting $4,500.00 in payment for masonry work ostensibly performed at Dolente & Sons garage. Two days later, Dolente & Sons issued a check in the amount of $3,820.40 to Edwards. Defendant admitted receiving the check. Both Dolente and his father testified that they neither contracted with Premier for such work nor was any such work done.

Trial Court opinion 7/10/89 at page 13. Based on this transaction, appellant was convicted of theft, a conviction which he does not challenge. However, he does argue that the evidence does not support his perjury and false swearing convictions arising from the testimony he gave to the Grand Jury regarding this kick-back scheme.

The Information charging perjury and false statements alleges that the statement "work was performed at Dolente's garage or place of business" was false. The transcript of appellant's Grand Jury testimony produced at trial was, in pertinent part, as follows:

Question: Now, the money that was paid to you by Dolente and the Union Hall District Council, those monies were paid directly to yourself; is that correct?

Answer: Yes, Ma'am.

Question: As far as Dolente's job was concerned, do you know what the job was exactly?

Answer: No. And I don't know what was done at the union hall. I don't know only except that a wall was built.

N.T., 5–6–88, pages 59–60.

Question: Now, there is another area that has been revealed or at least other jobs where some union people

worked on, one being [Dolente's] garage. Are you familiar with that?

Answer: I don't specifically know what was done but I know some people were over there to do some work.

\* \* \* \* \* \*

Question: Under whose direction did they go there?

Answer: You mean other than me telling somebody to do whatever needed to have been done?

Question: Who directed them to go?

Answer: I told you, either Hank or Ray or Manny. You know, Lou needed some work done and I did the same thing for Sam Staten. He needed some work done at the union where somebody was breaking into the labor hall and the men went down there and built a wall and both was [sic] done by Premier Construction Company.

*Id.*, at pages 55–56.

Appellant argues that there was a material and fatal variance between the allegations of perjury and false swearing contained in the Informations and the proof at trial. Although the Informations need not set forth the exact language alleged to be perjurious, it must sufficiently apprise appellant of the charges he must answer. *Commonwealth v. Lafferty*, 276 Pa.Super. 400, 419 A.2d 518 (1980). Appellant testified before the Grand Jury that Lou Dolente needed some work done and that it was done by Premier employees. The evidence presented at trial showed that appellant knew that no work was performed for Dolente and that the whole thing was a kick-back scheme. The jury had sufficient evidence to convict appellant of lying to the Grand Jury.

Appellant Edwards also was convicted of Theft By Unlawful Taking, 18 Pa.C.S. § 3921, for removing furniture and equipment valued at $23,383.65 from the construction site immediately before the RDA declared E & H to be in default. Appellant renews his argument that the Commonwealth did not prove that *the items were the property of another*. He claims that the only interest ULDC had in the

equipment was that of a security interest and he quotes 18 Pa.C.S. § 3901:

> Property in possession of the actor shall not be deemed property of another who has only a security interest therein, even if legal title is in the creditor pursuant to a conditional sales contract or other security agreement.

Appellant then concludes that since the equipment was not the property of another, as required by § 3922, the evidence was insufficient for conviction. We disagree.

The Commonwealth introduced evidence that E & H, through its corporate officer, Ernest Edwards, executed a leasehold mortgage pledging as security its interest in the leasehold Osage property and all the buildings, materials, supplies, tools, equipment and construction facilities and appliances located thereon. In addition to this standard leasehold mortgage, E & H also transferred all of its right, title and interest in, to and under the leasehold, the following mortgaged property: all building materials, tools, fixtures, appliances, machinery, furniture and equipment of any nature whatsoever owned by the mortgager now or at any time hereafter installed in, attached to or situated in, upon or about the real estate. About the only remaining interest that appellant had in the equipment involved in this case was his right to use it on the project. Therefore, when appellant removed the equipment and converted it to his own use, he unlawfully took the property which he had contractually acknowledged belonged to ULDC.

Appellant was also convicted of attempted theft by deception (18 Pa.C.S. § 3922) of a performance bond. Using knowingly false financial statements of Premier's corporate worth, appellant applied for a $67,000.00 performance bond from two insurance companies. A performance bond was not issued.

"Property" is defined under 18 Pa.C.S. § 3901 as:

> Anything of value, including real estate, tangible and intangible personal property, contract rights....

 A performance bond does comport with this property definition because it represents an insurer's promise to pay. "An insurer's promise to pay is intangible personal property, the value of which, *i.e.,* the insurer's credit and reputation, defendant attempted to steal." Appellee's Brief at page 41.

 Although a performance bond was not issued by an insurance company, appellant made complex arrangements to deceive the insurance company into issuing a performance bond.

Ebony, which Harris controlled, and which appellant had designated as the general contractor, was unable to secure performance bonds. On August 7, faced with the prospect of procuring a bondable general contractor or being removed himself, appellant established Premier, of which he was the sole proprietor, and set out to qualify it for bonding. Forewarned by Mr. Levy of Levy Redcross and Co., an accounting firm, that any bonding company would require liquidity in the insured, (N.T. 5/4/88, pp. 103–105) he arranged the deceptive illusion of having Premier appear financially sound. Knowing that there were insufficient funds in the E & H account, he convinced his silent partner, Beverly Harper, to draw a check in the sum of $175,000.00 payable to appellant. On August 14, he deposited it into Premier's account. (N.T. 5/4/88, pp. 110–114). He then prepared a financial statement, and had his accountant, after confirming the deposit, certify it. After having had the financial statement certified, the next day he withdrew $150,000.00 from Premier's account and returned it to E & H's account. (*Id.,* pp. 142–144). This was the financial status of Premier, when on August 16, appellant sent the financial statement, along with his application for bonding to Reliance Insurance Company, (*Id.,* p. 66) and to CIGNA Insurance Company. Both companies refused to bond Premier; at no time were they informed of the true financial condition of Premier. (N.T. 5/3/88, pp. 105, 106, 110, 116, 117). From the $25,000.00 left on deposit with Premier, appellant made one cash withdrawal and drew ten checks to

himself from August 15 to September 26 for a total of $11,300.00. (N.T. 5/4/88, pp. 161–166). Ms. Harper testified that she had expected that the full amount of $175,-000.00 would have been returned to E & H's account. (N.T. 5/4/88, pp. 112–115).

An attempt to commit a specific crime exists where a person performs an act which constitutes a substantial step towards the commission of that crime. 18 Pa.C.S. § 901. The evidence sustains the conviction of attempted theft by deception of a performance bond.

Appellant was convicted in Bill No. 3375 of Deceptive Business Practices. This Bill contained seven counts, each count restating one of the seven subsections of the statute. The statute reads as follows:

### § 4107. Deceptive Business Practices.

(a) Offense defined.—A person commits a misdemeanor of the second degree if, in the course of business, he:

(1) uses or possesses for use a false weight or measure, or any other device for falsely determining or recording any quality of quantity;

(2) sells, offers or exposes for sale, or delivers less than the represented quantity of any commodity or service;

(3) takes or attempts to take more than the represented quantity of any commodity or service as a buyer he furnishes the weight to measure;

(4) sells, offers or exposes for sale adulterated or mislabeled commodities;

(5) makes a false or misleading statement in any advertisement addressed to the public or to a substantial segment thereof for the purpose of promoting the purchase or sale of property or services;

(6) makes a false or misleading written statement for the purpose of obtaining property or credit; or

(7) makes a false or misleading written statement for the purpose of promoting the sale of securities, or

omits information required by law to be disclosed in written documents relating to securities.

There is no indication what action of appellant violated which subsection of the statute. The Commonwealth and the trial court assert that it was § 4107(a)(6), that was violated: a person commits a misdemeanor of the second degree if, in the course of business, he makes a false or misleading statement for the purpose of obtaining *property or credit*. (Emphasis added). The particular act of appellant which constituted this violation was the attempt at procuring a performance bond.[5]

 Appellant argues that this Bill was defective in that it did not provide him with the barest minimum notice necessary to defend against the seven counts. However, he contends that, even if § 4107(a)(6) is to be the controlling subsection, a performance bond does not qualify as either "property" or "credit". We disagree. A performance bond is a type of insurance which appellant was required to purchase in order for E & H to serve as the general contractor on the project. A performance bond was obviously a valued property which appellant attempted to buy. § 4107(a)(6) states that a person commits a misdemeanor if he *attempts* to obtain property or credit by making false or misleading statements. Whether or not that person acquires the desired property or credit is of no consequence; the violation of § 4107(a)(6) is already committed. This statute is similar to 40 Pa.S. § 474, mentioned above, which makes it a crime to attempt to obtain insurance by fraudulent application.

 In Bills Nos. 3370 and 3395, appellant was convicted of Theft by Unlawful Taking (18 Pa.C.S. § 3921) and Theft by Deception (18 Pa.C.S. § 3922) in connection with his receiving $6,341.93 for building a wall for a union hall. Appellant used Premier employees, who were being paid by E & H to work on the project, to do outside work for him on a private contract. He made no reimbursement to either

5. The Commonwealth gives no explanation why appellant was charged with the other six counts in the Bill.

Premier or E & H for the use of the laborers and simply pocketed the proceeds from the outside work. Thus, E & H was using ULDC's money to pay for labor on a non-project related job.

Appellant argues that once ULDC disbursed this money to E & H, and E & H paid it out to Premier, Premier was free to use it to pay its employees and direct them to work in any manner it deemed fit. Appellant again reiterates his position that the loan monies could not be the subject of a theft. We have already held that when appellant converted the funds to his own use—regardless of the manner of conversion—he was guilty of theft. Here, he misappropriated Premier's labor and deceived E & H into paying salaries for non-Project work, all the while misusing ULDC's money.

■■■ Appellant next argues that trial court erred by prohibiting him from presenting evidence that he took over $23,000.00 worth of equipment from the job site under a claim of right. This issue was not raised by appellant in the lower court and cannot be raised for the first time on appeal. *See* Pa.R.A.P. 302.

### INEFFECTIVENESS OF COUNSEL

■■■ Represented by new counsel, appellant alleges several instances of trial counsel's ineffectiveness. In considering the ineffectiveness claim, we do so under the following standard:

[First,] whether the underlying claim is of arguable merit; that is, whether the disputed action or omission by counsel was of questionable legal soundness. [Second,] whether counsel had any reasonable basis for the questionable action or omission which was designed to effectuate his client's interest. [Third,] whether counsel's improper course of conduct worked to his prejudice, ie., had an adverse effect upon the outcome of the proceedings.

*Commonwealth v. Davis*, 518 Pa. 77, 83, 541 A.2d 315, 318 (1988). (citations omitted). Moreover, claims of ineffective-

ness will not be considered in a vacuum; appellant must allege sufficient facts upon which a reviewing court can assess counsel's ineffectiveness. *Commonwealth v. Durst*, 522 Pa. 2, 559 A.2d 504 (1989).

As to trial counsel's failure to submit any points for charge, appellant basically contends that trial counsel should have requested the judge to instruct the jury that the evidence was insufficient, as a matter of law, to convict appellant. Rather than "points for charge", this argument speaks to a motion for a directed verdict of acquittal. As we have separately found the evidence for conviction to be sufficient, we cannot deem counsel ineffective for failing to make a baseless motion.

Appellant argues the trial counsel was ineffective for failing to present evidence of standard custom and practice in the construction industry. He contends that this would have shown that the line-item estimated expenses, listed in his application, did not constitute an agreement or legal obligation which required him to spend the money in a particular way. Appellant, with many years of experience in the construction industry, testified that what he did with the advanced money was common practice in the industry. He contends that trial counsel should have produced witnesses willing to testify that the practice of pocketing advance money rather than spending it on the job was common in the construction industry. However, as discussed previously, the application between appellant and ULDC by its very terms defined and restricted the uses for the Project money. Therefore, counsel's failure to call witnesses regarding the supposed common practice in the industry cannot constitute ineffectiveness in a case where the alleged common practice did not apply.

Appellant argues that trial counsel was ineffective for failing to request the charge that character evidence alone may be sufficient to raise a reasonable doubt, and thus justify an acquittal of the charges. Although trial counsel may not have requested it, the trial judge so in-

structed the jury (N.T., 5/10/89 at pages 22–23) and thus this claim is without merit.

■ Appellant argues that trial counsel was ineffective for not objecting to the prosecutor's references to the advanced funds as "taxpayer's money." He contends that this label is false in that ULDC was a private corporation and, therefore, the money did not belong to the taxpayers. He further argues that such a reference to the money encouraged the jury to decide the case on their own economic self-interest rather than on the merits. It is clear that the evidence showed that the federal government and the City of Philadelphia were the sources of the construction funds. Although referring to the funds as "taxpayers' money" may have been technically incorrect, public funds were clearly involved. However, we conclude that the outcome would have been no different if the funds had been called "ULDC's money." We find that appellant was not prejudiced by this reference.

■ Appellant also argues that trial counsel was ineffective for failing to withdraw from the case. Appellant contends that trial counsel was involved in a series of transactions underlying the criminal charges, including negotiating the relevant contracts, advising him that he had a right to the equipment at the construction site, and actually carrying some of the equipment away. However, trial counsel was not the only attorney who represented appellant during the contract negotiations and who advised him on the decision to remove the equipment from the construction site. Rotan Lee, Esq. was co-counsel to appellant regarding the Osage Project and he did testify on behalf of appellant. To what extent trial counsel could have presented favorable testimony in addition to that of Attorney Lee is not specified by appellant and we cannot base a finding of ineffectiveness on bare allegations alone.

Appellant also contends that trial counsel's fear for his own criminal liability colored the advocacy which appellant received during trial. Appellant, however, offers no basis

for this reckless allegation. We conclude that trial counsel had no reason to withdraw from this case.

Appellant's final argument that the sentences imposed should be vacated due to the unreasonable applications of the Sentencing Guidelines and the unreasonable impositions of sentences outside the Guidelines. This issue need not be discussed because it is waived. Appellant failed to provide a separate, concise statement of reasons for allowance of appeal, raising a substantial question as to the appropriateness of the sentence imposed under the Sentencing Code as a whole. *Commonwealth v. Tuladziecki*, 513 Pa. 508, 522 A.2d 17 (1987).

Judgment of sentence affirmed.

OLSZEWSKI, J., files a concurring opinion.

OLSZEWSKI, Judge, concurring:

I concur with Judge Cavanaugh's learned and comprehensive disposition of the issues raised by appellant. I write separately in order to further clarify the proper disposition of the count of misapplication of entrusted funds and the count of attempted theft of the performance bond.

It is argued that 18 Pa.C.S.A. § 4113 only applies to situations where the misapplication of funds violates a fiduciary or trust relationship. This construction of the statute would make the clause, "or property of the government or of a financial institution," superfluous. If the key to the statute is the fiduciary status of the offender, then property of the government or of a financial institution which is entrusted to a fiduciary is clearly a subset of, and contained within, "property that has been entrusted to him as a fiduciary." 18 Pa.C.S.A. § 4113(a). It is a fundamental principle of statutory construction that all elements of a statute are to be given meaning; to adopt the construction that the statute only applies to fiduciaries makes the rest of the subsection unnecessary. To prevent this, the statute must apply to three separate types of property: government property, financial institution property, as well as

property entrusted to a fiduciary. An individual who misapplies any of these three types of property violates the statute.

It is also argued that affirming the conviction for violation of § 4113 herein is akin to convicting a person for the theft of a public assistance check. No one would dispute that once an individual properly receives a public assistance check, he is free to exercise his own judgment as to how to best spend the money to achieve its beneficial purpose. Such was not the case here; the majority correctly notes that Edwards was not free to spend the advance monies for items not listed in E & H's application to ULDC. I submit the restrictions placed upon the advance would be more akin to a person using food stamps to purchase inappropriate items. Edwards could purchase items which fit the description in his application but could not treat the funds as his own. Appellant herein received these monies from the government as part of an agreement to apply them to the listed mobilization costs. When he chose to divert them to his own purposes, he violated his agreement with the ULDC and so misapplied the funds in violation of 18 Pa.C. S.A. § 4113.

I also wish to clarify Edwards' conviction for attempted theft of the performance bond. The bond is the insurer's promise to pay. "It is intangible personal property, the value of which, *i.e.*, the insurer's credit and reputation, the defendant attempted to steal." (Appellee's Brief at 41). It is argued that because Edwards was not successful in securing the bond he did not make a substantial step toward theft of the value of the bond by deception. I cannot agree.

The majority recognizes that the value of the promise is the insurer's credit and reputation. It is that value, not the paper bond, which Edwards attempted to secure by deception. While it is technically correct to state that no performance bond ever existed, its value, the credit and reputation, did exist. The mere fact that this property is intangible does not prevent an attempted theft thereof.

574

Under the reasoning advanced by appellant, an attempt at theft by deception, where payment by the victim was to be made by check, would not violate the statute as long as the victim did not write out the check. A check is a promise to pay, backed by the drawer's credit. The fact that the check is not drawn does not negate the attempt to steal the credit which backs the check. So too, the fact that the bond was not issued does not negate Edwards' attempt to steal the credit and reputation of the insurer which would have backed the bond.