IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Givelify, LLC, Tayo Ademuyiwa     :
and Walle Mafolasire,     :
          Petitioners     :
     :  No.  329 C.D. 2018
     v.     :
     :  Argued:  February 12, 2019
Department of Banking and     :
Securities,     :
          Respondent     :

BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
            HONORABLE ROBERT SIMPSON, Judge
            HONORABLE P. KEVIN BROBSON, Judge
            HONORABLE PATRICIA A. McCULLOUGH, Judge
            HONORABLE MICHAEL H. WOJCIK, Judge
            HONORABLE CHRISTINE FIZZANO CANNON, Judge
            HONORABLE ELLEN CEISLER, Judge

OPINION BY
JUDGE McCULLOUGH          FILED:  May 30, 2019

Givelify, LLC, Tayo Ademuyiwa, the Chief Executive Officer of Givelify, and Walle Mafolasire, the owner and a co-founder of Givelify (collectively, Petitioner), petition for review from the February 14, 2018 order of the Pennsylvania Department of Banking and Securities Commission (Commission), which adopted the proposed report of a hearing officer concluding that Petitioner, without the proper licensure, engaged in the business of "transmitting money" in violation of the act commonly known as Pennsylvania Money Transmitter Act (MTA).[1]  Upon review, we reverse.

---

[1]  Act 249 of 1965-249, P.L. 490, 7 P.S. §§6101-6118, *as amended*.

## Background

The facts in this case are undisputed. The legal issues raised by Petitioner involve the interpretation and application of the MTA to those facts, which, in pertinent part, are as follows.

Petitioner solicits donations for non-profit and religious organizations and facilitates the submission of donations through a software application that was made available over the internet at Givelify.com. (Findings of Fact (F.F.) Nos. 5, 7.) More particularly,

> 8. [Petitioner's] service requires donors to establish an account through its software application which captures electronic identifying information, including a donor's name, tax identification number, bank/checking account number, credit or debit card number, credit or debit card security code, email address, and the amount to be donated.
>
> 9. [Petitioner's] service also requires the religious organization and/or non-profit receiving a donation to register with [Petitioner] through its software application during which [Petitioner] captures the donation recipient's electronic identifying information, including its name, address, tax identification number/EIN [electronic information number], name of its authorized person and bank/checking account information.
>
> 10. [Petitioner] encrypts a donor's electronic identifying information, then sends the encrypted information to Vantiv.
>
> 11. Vantiv transmits a "token" to [Petitioner] within seconds of receiving the donor's electronic identifying information. The token does not contain any personal identifying information but, instead, contains only a unique identifier issued by Vantiv that identifies the donor to Vantiv and allows Vantiv to match the unique identifier to the donor's information on Vantiv's server.

12.    [Petitioner] deletes the donor's electronic identifying information from its servers upon its receipt of the token from Vantiv.

13.    [Petitioner] also transmits the electronic identifying information of the donation recipient to Vantiv [which] then generates a Merchant Identification Number ("MID") to identify the donation recipient.

14.    A donor can use [Petitioner's] software application to identify a donation amount and a recipient of the donation on either a one-time or recurring basis.  Thereafter, [Petitioner] simultaneously transmits the donor's token, the MID, and the donation amount to Vantiv.

**15.    Vantiv, thereafter, contacts the donor's bank/credit card to confirm the existence of sufficient funds to pay for the donation.**

**16.    The donor's bank/credit card provides Vantiv with an approval code for the transfer of funds if sufficient funds exist.**

17.    Vantiv notifies [Petitioner] when it receives approval for the transaction from the donor's bank/credit card.

18.    [Petitioner] then notifies the donor that the transaction has been completed, and notifies the donation recipient of the donation.

**19. Vantiv instructs the donor's credit card/bank to release the donated funds upon its receipt of the approval from the credit card/bank.**

**20.    The donor's credit card/bank thereafter releases the funds which are deposited into a Vantiv account at Fifth Third Bank.**

**21.    Fifth Third Bank then transfers the donated amount directly into the donation recipient's bank account after first subtracting the remittance amount it pays to [Petitioner].**

3

22. The remittance tendered to [Petitioner] is 2.9%, plus 30¢ per transaction.

23. Vantiv submits to [Petitioner] a monthly invoice for the services it provided to [Petitioner].

24. Vantiv was identified in a Bank Card Merchant Agreement as a payment processor and was collectively identified with Fifth Third Bank as a "Bank" in the Agreement.

**25. [Petitioner] utilized the services of Vantiv as a payment processor to assist with the electronic transfer of funds from donors to donation recipients, including not-for-profit organizations and religious organizations.**

\* \* \*

30. Vantiv is not a licensed money transmitter.

31. [Petitioner] is not, nor has it ever been licensed by the Department as a money transmitter.

**32. [Petitioner] has not directly transferred money from donors to donation recipients.** Instead, [Petitioner] facilitated the transfer of the money through its affiliation with Vantiv based upon identifying information of donors and donation recipients it captured through its software application.

**33. Donated funds transferred through the use of [Petitioner's] software application have never been deposited into an account directly owned or controlled by [Petitioner].**

(F.F. Nos. 8-25, 30-33) (emphasis added) (internal citations to the record omitted).

On September 19, 2016, the Compliance Office of the Department of Banking and Securities (Department) issued an *Order to Cease and Desist and Pay a Fine* (Order) in the amount of $176,000.00 against Petitioner. The Department alleged that Petitioner operated a business that transmitted money or credit in

4

Pennsylvania without a license and therefore contravened former Section 2 of the MTA, which provided,

> No person[2] shall engage in the business of **transmitting money by means of a transmittal instrument** for a fee or other consideration without first having obtained a license from the [Department] nor shall any person engage in such business as an agent except as an agent of a person licensed or exempted under this act.

*Former* 7 P.S. §6102 (emphasis added).[3, 4] Although the General Assembly did not define the term "transmitting money" in the former version of the MTA (or the current version), it did provide a delineation for the phrase "transmittal instrument." Specifically, a "transmittal instrument" was classified as being "any check, draft, money order, personal money order or method for the payment of money or transmittal of credit, other than a merchandise gift certificate sold in the regular

---

[2] A "person" was defined to include "an individual or an organization." *Former* Section 1 of the MTA, 7 P.S. §6101.

[3] On November 3, 2016, Governor Wolf signed Act 129 of 2016 into law, which became effective on January 2, 2017. *See* Act of November 3, 2016, P.L. 1002, No. 129. Because all of Petitioner's activities that formed the basis of the allegedly unlawful conduct occurred prior to the effective date of Act 129 of 2016, the Commission applied the former version of the MTA. (Commission's decision at 1-2.) This particular ruling by the Commission has not been challenged by either Petitioner or the Department. We nevertheless note that Section 16 of Act 129 states that the amended version of the statute "shall not apply to a transaction which was conducted prior to the effective date of this [S]ection." *Id.*

[4] At present, Section 2(a) of the MTA reads as follows: "No person shall engage in the business of transmitting money by means of a transmittal instrument for a fee or other consideration with or on behalf of an individual without first having obtained a license from the department." 7 P.S. §6102(a). Arguably, the addition of the "with or on behalf" language enlarged the class of individuals/entities that may be liable for transmitting money without a license.

course of business by a vendor of personal property or services." Former Section 1 of the MTA, 7 P.S. §6101 (Definitions).[5]

Petitioner appealed the Department's Order and filed an Answer and New Matter on October 19, 2016. The Department filed a responsive Answer on October 24, 2016. By letter dated December 7, 2016, the Secretary of the Department delegated the matter to a hearing officer, who convened a hearing on April 24, 2017.

At the hearing, the Department introduced the testimony of its Compliance Office Chief, James Keiser, and Theresa Jones, a Non-Depository Financial Institution Examiner II. The Department also admitted, without objection, 11 exhibits that consisted of correspondence, agreements, financial documents, and other documentary evidence related to Petitioner's business affairs. In rebuttal, Petitioner presented the testimony of Mafolasire, Reverend Damone Jones, and Pastor Chandra Williams, whose testimony explained how Petitioner's business operated from their respective vantage points. Petitioner further submitted five exhibits into the record without objection. These exhibits were comprised of financial agreements and documents that were created and/or executed in connection with the donative transactions.

Following the conclusion of the hearing, the parties filed post-hearing briefs as ordered by the hearing officer. In its brief, the Department contended that Petitioner had transmitted money because it created a business platform, via its software application, which served as an indispensable part of a chain of events

---

[5] The term "transmittal instrument" is currently defined as "any check, draft, money order, personal money order, debit card, stored value card, electronic transfer or other method for the payment of money or transmittal of credit, other than a merchandise gift certificate or instrument with a similar purpose sold in the regular course of business by a vendor of personal property or services in a closed loop system or hybrid closed loop system." 7 P.S. §6101 (Definitions).

6

through which money was transferred from the donors to the recipients of the donations. Focusing on statutory language, the Department also argued that Petitioner did "engage in the business of transmitting money" because its software application **results in the transmission of money**, regardless of whether Petitioner actually receives, possesses, or deposits the donated funds. *See former* 7 P.S. §6102. The Department further posited that Petitioner's business model, namely the structure and manner in which the software program functioned and collected payment information, constituted a "method for payment of money or transmittal of credit" under the MTA. *See former* 7 P.S. §6101.

In response, Petitioner argued in its brief that it was not engaged in the business of transmitting money and denied that its software application was a transmittal instrument under the MTA. More specifically, Petitioner asserted that the license requirement of the MTA applies only to those entities that actually transmit money, and not to entities that cause or request another party to transmit money. Petitioner maintained that its activities simply connected donors to the institution to which they desired to donate, and that the transmission of money was outsourced to and conducted solely by Vantiv. In addition, Petitioner contended that, pursuant to the express language of the MTA, an entity can be a transmitter of money only when that entity secures possession and custody of money from a source and then transmits the money to another source. According to Petitioner, it never transmitted money as a matter of fact; the donations were never placed into or passed through any of its accounts; and its software program was not the equivalent of a negotiable instrument.

By proposed report dated October 17, 2017, the hearing officer, based on the above findings of fact, concluded that Petitioner's "software/business model constitute[d] a 'transmittal instrument' under the former version of the MTA" and that Petitioner had "engaged in the unlicensed business of transmitting money by

7

means of a transmittal instrument for a fee or other consideration . . . in violation of the MTA." (Conclusions of Law (COL) Nos. 2-3.) The hearing officer further determined that the fine imposed by the Department in the amount of $176,000.00 ($2,000.00 per violation for operating on 88 Sundays) was supported by substantial evidence and did not amount to an abuse of discretion. (COL No. 4; F.F. Nos. 42-43.)

In concluding that Petitioner was engaged in the business of transmitting money, the hearing officer reasoned as follows:

> As set forth by the plain language of the MTA . . . the prohibition against the unlicensed transmittal of money is not limited to the person/entity who performs the actual act of transmitting money. **Instead, the language of the MTA is broader, and includes those [that] are "engage[d] in the business" of transmitting money.** To adopt a reading of the MTA in the manner proffered by [Petitioner] would be tantamount to reading that provision out of the statute.
>
> At its most fundamental level, the purpose of [Petitioner's] software and its business model is to facilitate the movement of money from donors to donation recipients. If [Petitioner's] software merely worked to connect donors and donation recipients as [Petitioner] suggest[s], its business model would cease to involve [Petitioner] once that connection has been established. Instead, [Petitioner] remains inextricably intertwined with the donation process by conducting background checks on donors and donation recipients, by encrypting and transmitting identifying information to a third party, and by receiving, storing and linking donations to MIDs and tokens used to identify donors and their intended beneficiaries. The necessity and applicability of the MIDs and tokens to [Petitioner's] business model remain the same regardless of who actually creates those features. Importantly, the record also shows that [Petitioner] receives a fee/remittance for each transaction completed through its software, rather than charging a one-time fee. Based upon the totality of [Petitioner's] involvement in [the] donation process,

8

including its charging of the fees it earns based precisely upon that continuing involvement, the record shows that [Petitioner] engages in the business of transmitting money under the MTA, **even if it is not the party [that] actually transfers the donated funds to the donation recipients.**

(Hearing Officer's (H.O.) Decision at 17-18) (emphasis added).

In determining that Petitioner utilized a transmittal instrument, the hearing officer offered the following rationale:

> The record shows that [Petitioner's] software is used to obtain identifying information from donors and donation recipients, and that it uses the token and MID to identify and pair donors to donation recipients. Although [Petitioner] does not create the token and/or MID as component parts of [Petitioner's] business model, the software unquestionably gathers and organizes the substantive information transmitted to the third-party payment processor which created those features. [Petitioner's] software/business model similarly establishes the vehicle and procedural mechanism by which donations are transmitted to their recipients. Accordingly, all of the component parts of [Petitioner's] business model, including those comprising [Petitioner's] gathering of substantive information, and the instructions it provides to the payment processor to use the tokens and MID's [sic], constitutes a method used to facilitate the transfer of money. Indeed, the integrated use of the component parts of the process incorporated into [Petitioner's] software is not only a method for the transmission of money, it is the method of transmission under [Petitioner's] business model.
>
> \* \* \*
>
> [A]s previously noted, the component parts of [Petitioner's] business model were not used in isolation to transfer money but, instead, were integrated into the overall [] business model through its software which, in turn, was used in the aggregate to effectuate the transmission of donated funds. For the foregoing reasons, this [h]earing [e]xaminer finds that the [Petitioner's] business model/software constituted a transmittal instrument as an "other method for the payment of money or transmittal of credit" under the MTA.

9

(H.O. Decision at 22-24) (emphasis added).

Thereafter, Petitioner appealed to the Commission. By order and opinion dated February 14, 2018, the Commission adopted and affirmed the proposed report of the hearing officer.[6] Petitioner then filed a petition for review in this Court.

## Discussion

Before this Court,[7] Petitioner and the Department, in large part, renew and reiterate the arguments that they advanced before the hearing officer and the Commission. For its part, the Department adds that the Commission is entitled to substantial deference in interpreting the MTA. On its side, Petitioner cites a variety of state statutes that define the term "money transmission" as requiring the receipt of money for subsequent transmission and contends that this is the "peculiar and appropriate" meaning of the phrase "transmitting money" under the MTA. (Petitioner's brief at 20-22.)

As with most matters that involve or implicate a statute, we begin by viewing and analyzing the express words of the statute itself. *See Kmonk-Sullivan v. State Farm Mutual Automobile Insurance Co.*, 788 A.2d 955, 959 (Pa. 2001). The object of statutory construction is to ascertain and effectuate legislative intent, and a statute's plain language generally provides the best indication of legislative intent.

---

[6] While affirming the hearing report, the Commission modified the hearing officer's discussion on whether Petitioner was an "agent" for purposes of an exemption under the MTA. (Commission's decision at 1-5.) Because this analysis has no bearing on our disposition of this case, and Petitioner does not assert that it is an exempted agent in its appellate brief, we do not mention the matter further.

[7] Our scope of review is limited to determining whether constitutional rights were violated, whether the adjudication is in accordance with the law, or whether the necessary findings of fact are supported by substantial evidence. *Pennsylvania Savings Association v. Department of Banking*, 523 A.2d 837, 839 (Pa. Cmwlth. 1987).

*Malt Beverages Distributors Association v. Pennsylvania Liquor Control Board*, 918 A.2d 171, 176 (Pa. Cmwlth. 2007) (en banc), *aff'd*, 974 A.2d 1144 (Pa. 2009).

Where the words of a statute are clear and free from ambiguity, the legislative intent is to be gleaned from those very words, and the plain language is not to be disregarded under the pretext of pursuing its spirit. *Pennsylvania Financial Responsibility Assigned Claims Plan v. English*, 664 A.2d 84, 87 (Pa. 1995); *Coretsky v. Board of Commissioners of Butler Township*, 555 A.2d 72, 74 (Pa. 1989). In reading the plain language of a statute, "[w]ords and phrases shall be construed according to rules of grammar and according to their common and approved usage." Section 1903(a) of Statutory Construction Act of 1972 (SCA), 1 Pa. C.S. §1903(a). "One way to ascertain the plain meaning and ordinary usage of terms is by reference to a dictionary definition." *In re Beyer*, 115 A.3d 835, 839 (Pa. 2015).

As noted above, former Section 2 of the MTA makes it unlawful for an individual or organization, without the required license, to "engage in the business of **transmitting money by means of a transmittal instrument** for a fee or other consideration." *Former* 7 P.S. §6102 (emphasis added). The term "transmittal instrument" was defined in the MTA as "any check, draft, money order, personal money order or method for the payment of money or transmittal of credit." *Former* 7 P.S. §6101.

Viewing the plain language of former section 2 of the MTA in a common sense fashion, we conclude that the Commission, in adopting the hearing officer's proposed report, misconstrued the meaning of the statute. On a basic and critical level, the Commission erroneously interpreted the terminology "engage in the business" in an overly expansive manner and essentially read it as prohibiting any conduct that contributes toward—or has a tangential involvement with—the concrete and real act of "transmitting money." Contrary to the Commission's construction, the

11

phrase "engage in the business of" is prefatory in nature and does not define the substantive action that the statute describes as offensive. Rather, the courts have long held that the phraseology characterizes the extent to which the conduct or activity has occurred and expresses the requirement that an individual or organization be operating a "business" as opposed to conducting an isolated or infrequent transaction. *See, e.g.*, *United States v. Gross*, 451 F.2d 1355, 1357-58 (7th Cir. 1971); *Marble v. Clein*, 347 P.2d 830, 832-33 & n.2 (Wash. 1959) (collecting and discussing cases and treatises); *Marble*, 347 P.2d at 832 ("Appellant was not *engaged in the business* of dealing in securities, but, on the contrary, the complaint alleges appellant was involved in but an isolated transaction. In the absence of any language bringing a single transaction within the statutory prohibition, the act cannot be so extended.") (emphasis in original); *Jones v. State*, 149 So. 855, 856-57 (Ala. Ct. App. 1933) ("The term 'engaged in business' has been defined so frequently by the appellate courts of this state and by other competent authorities, we deem it unnecessary to enter again into a prolonged discussion on this point. . . . [T]he term … means that employment which occupies the time, attention, and labor of the person so engaged in business [and] the law uses that term to indicate a regular . . . employment, not one that is occasional, [or] irregular[.]").

Based upon its most natural reading, former Section 2 of the MTA requires a license when an individual or organization has been "transmitting money." In this regard, the key term in ascertaining the defining characteristic of the conduct that is proscribed by the statute is "transmitting." Reduced from its gerund form, the verb "transmit" is defined by Black's Law Dictionary, in relevant part, as, "To send or transfer (a thing) from one person or place to another." BLACK'S LAW DICTIONARY 1638 (9th ed. 2009). According to Webster's dictionary, "transmit" means to "be conveyed to another person or place : SEND < he secured soldiers' pay and

12

*transmitted* it to their families[.]" WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2429 (1986) (emphasis in original). In *United States v. Velastegui*, 199 F.3d 590 (2d Cir. 1999), the United States Court of Appeals for the Second Circuit explained that "[a] money transmitting business receives money from a customer and then, for a fee paid by the customer, transmits that money to a recipient in a place that the customer designates[.]" *Id.* at 592. Applying this understanding of what action is necessary for a person or entity to be "transmitting money" to the hearing officer's findings of fact and reasoning, we conclude that Petitioner was not engaged in the business of transmitting money.

Here, through its software application, Petitioner captured and encrypted the identifying information of the donor and the religious/non-profit organization receiving the donation and then sent this information, including the MID and donation amount, to Vantiv. (F.F. Nos. 8-14.) At this point, Petitioner's role in the transaction was, in effect, completed, and Petitioner thereafter participated in a very limited manner. Specifically, apart from receiving notification from Vantiv and sending notification to the donor with respect to the status and accomplishment of the donation transfer, Petitioner obtained a remittance amount from Fifth Third Bank and a monthly invoice from Vantiv. (F.F. Nos. 17-18, 21-23.) This is the full degree and scope of Petitioner's involvement in the transaction.

Meanwhile, Vantiv "contact[ed] the donor's bank/credit card to confirm the existence of sufficient funds to pay for the donation"; "The donor's bank/credit card provide[d] Vantiv with an approval code for the transfer of funds if sufficient funds exist"; "Vantiv instruct[ed] the donor's credit card/bank to release the donated funds upon its receipt of the approval from the credit card/bank"; "The donor's credit card/bank thereafter release[d] the funds which are deposited into a Vantiv account at Fifth Third Bank"; and "Fifth Third Bank then transfer[red] the donated amount

13

directly into the donation recipient's bank account[.]" (F.F. Nos. 15-16, 19-21.) Importantly, Petitioner did not obtain or secure from the donor the "money," or the "check, draft, money order, personal money order or method for the payment of money or transmittal of credit," *former* 7 P.S. §6101, that was used as the funds to satisfy the donation amount. Also, Petitioner had not transmitted or "transferred money from donors to donation recipients," and the donated funds were "never [] deposited into an account directly owned or controlled by [Petitioner]." (F.F. Nos. 32-33.)

Given these facts, we cannot conclude that Petitioner was "transmitting money" as that term exists in former Section 2 of the MTA. Although Petitioner's software application can be deemed to have acquired and "transmitted" information vital to the donative transactions to Vantiv, by no means was Petitioner "transmitting money" itself, or transmitting some other "method for the payment" of the donation, "from one person or place to another." Black's Law Dictionary 1638 (9th ed. 2009). *Cf. Flava Works, Inc. v. Gunter*, 689 F.3d 754, 761 (7th Cir. 2012) ("By listing plays and giving the name and address of the theaters where they are being performed, the *New Yorker* is not performing them. It is not 'transmitting or communicating' them.").[8]

_____

[8] In this regard, an apt analogy may be made to the circumstance where a defendant arranges a drug sale between a dealer and a buyer. Typically, in such a situation, the defendant obtains information from the buyer as to the type, price, and quantity of the drugs that the buyer desires to purchase, conveys this information to the dealer, and then arranges a time and place for the dealer to meet the buyer, at which point the dealer "delivers" or "transfers" the drugs to the buyer. *See Commonwealth v. Lanager*, 521 A.2d 53, 55-56 & 58 (Pa. Super. 1987). The defendant, however, cannot be convicted as a principal for "delivering" or "transferring" the drugs because the commonly accepted meaning of "transfer" is "[t]o convey or remove from one . . . person to another; pass or hand over from one to another," *Commonwealth v. Cameron*, 372 A.2d 904, 907 (Pa. Super. 1977), and the defendant did not "actually transfer[] drugs" or "physically convey[] drugs to another person," *Commonwealth v. Murphy*, 844 A.2d 1228, 1234 (Pa. 2004). In theory,
**(Footnote continued on next page…)**

14

Here, the hearing officer essentially determined that Petitioner violated Section 2 of the MTA by imposing a theory of "constructive transmitting money" liability based on the fact that Petitioner "facilitated" the transactions. To be sure, even though Petitioner was "not the party who actually transferr[ed] the donated funds to the donation recipients," (H.O. Decision at 18), the hearing officer found that Petitioner engaged in prohibited conduct because "[Petitioner] facilitated the transfer of the money through its affiliation with Vantiv based upon identifying information of donors and donation recipients it captured through its software application." (F.F. No. 32.) The hearing officer also reasoned that "[a]t its most fundamental level, the purpose of [Petitioner's] software and its business model [was] to facilitate the movement of money from donors to donation recipients," and that "all of the component parts of the [Petitioner's] business model, including those comprising [Petitioner's] gathering of substantive information, and the instructions it provides to the payment processor to use the tokens and MID'\s, constitute[d] a method used to facilitate the transfer of money." (H.O. Decision at 17, 22.) The Dissent, in essence, follows the approach taken by the hearing officer, postulating that Petitioner flouted the statute because it had an "integral role in the transactions," Dissent slip op. at 6, and "offers" the "transmission of money" as a "service" through Vantiv. *Id.* at 7.[9]

---

**(continued…)**

the same concept is applicable here, as Petitioner, in actuality, was not "transmitting money," but was merely collecting and supplying information.

[9] Perhaps conceding that Petitioner was not actually "transmitting money," as the hearing officer so found, the Dissent nonetheless asserts that former Section 2 of the MTA is a remedial statute. The Dissent's analysis fails to address the phrase "transmitting money" and effectively severs it from the statute, rendering the critical language inoperative and nugatory. However, "[s]pecific and clear statutory language cannot be ignored under the guise of liberal construction or public policy considerations," *Toner v. Nationwide Insurance Co.*, 610 A.2d 53, 56 (Pa. Super. 1992); *see Davis v. Government Employees Insurance Company*, 454 A.2d 973, 975 (Pa. 1982), and

**(Footnote continued on next page…)**

15

However, even if Petitioner's involvement in the transactions were sufficient to establish that Petitioner was "promoting or facilitating" the act of "transmitting money," or directed another to convey money or engage in the business of "transmitting money," this does not alter the fact that no violation of former Section 2 of the MTA had occurred. Quite simply, the bottom line is that the MTA does not prohibit this type of conduct. Unlike other statutes, the language of the MTA is markedly insufficient to inflict a licensing requirement on an individual or organization based upon a conspiratorial relationship with another entity or the directing, aiding, or abetting of that entity's act of "transmitting money."[10] As it has often been said, "it is not the function or duty of this Court or any other court to add provisions to a statute not provided for by the legislature," *Lower Merion Fraternal Order of Police Lodge No. 28 v. Lower Merion Township*, 512 A.2d 612, 616 (Pa. 1986), and we decline to that here.

"[E]ven though a court may be convinced that the legislature intended to enact something different from that which it did, if the language of the statute is clear and unambiguous the statute must be given its plain and obvious meaning." *Commonwealth v. Rieck Investment Corporation*, 213 A.2d 277, 281-282 (Pa. 1965). Based on the plain language of former Section 2 of the MTA, we conclude that the Commission erred in determining that Petitioner was unlawfully engaged in the

---

**(continued…)**

"[t]he supreme principle of statutory interpretation [is] that each word used by the Legislature has meaning and was used for a reason, not as mere surplusage." *Fisher v. Department of Public Welfare*, 501 A.2d 617, 619-20 (Pa. 1985).

[10] *Cf.* Sections 306(c) and 903(a) of the Crimes Code, 18 Pa.C.S. §§306(c), 903(a); Section 102 of The Controlled Substance, Drug, Device and Cosmetic Act, Act of April 14, 1972, P.L. 233, *as amended,* 35 P.S. §780-102 (Definitions).

16

business of transmitting money. Because our decision is based solely on the clear and unambiguous language of former Section 2 of the MTA, the Commission is not entitled to any administrative deference in its interpretation of that provision. *See Seeton v. Pennsylvania Game Commission*, 937 A.2d 1028, 1037 (Pa. 2007). We nevertheless note that Section 2 of the MTA, as well as other provisions of the MTA, underwent substantial changes when Act 129 of 2016 was enacted into law. *See supra* notes 3-5. The Court expresses no view as to whether Petitioner's activities run afoul of the present version of the MTA.

For the above-stated reasons, we reverse the order of the Commission that adopted and affirmed the proposed report of the hearing officer.

_____
PATRICIA A. McCULLOUGH, Judge

17

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Givelify, LLC, Tayo Ademuyiwa       :
and Walle Mafolasire,                :
            Petitioners       :
                           :  No.  329 C.D. 2018
            v.              :
                           :
Department of Banking and       :
Securities,                    :
            Respondent     :

## ***ORDER***

AND NOW, this 30th day of May, 2019, the February 14, 2018 order of the Pennsylvania Department of Banking and Securities Commission is hereby REVERSED.

 

_____
PATRICIA A. McCULLOUGH, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Givelify, LLC, Tayo Ademuyiwa : 
and Walle Mafolasire, : 
                Petitioners : 
                 : 
          v. : No. 329 C.D. 2018
                 : Argued: February 12, 2019
Department of Banking and Securities, : 
                Respondent : 


BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
              HONORABLE ROBERT SIMPSON, Judge
              HONORABLE P. KEVIN BROBSON, Judge
              HONORABLE PATRICIA A. McCULLOUGH, Judge
              HONORABLE MICHAEL H. WOJCIK, Judge
              HONORABLE CHRISTINE FIZZANO CANNON, Judge
              HONORABLE ELLEN CEISLER, Judge

CONCURRING OPINION
BY PRESIDENT JUDGE LEAVITT              FILED: May 30, 2019

        I join the majority opinion. I write separately to respond to the dissent's contention that the act commonly known as the Pennsylvania Money Transmitter Act[1] (Act) is a consumer protection or remedial statute, subject to a "broad construction." Dissenting op. at 5. To the contrary, the Act is a regulatory statute, with penal provisions that are subject to a strict construction.

        The Act regulates those who engage in "the business of transmitting money by means of a transmittal instrument for a fee or other consideration" by imposing financial net worth and bonding requirements. Section 6 of the Act, 7 P.S. §6106. Each person in the business must be licensed, and a violation of the Act subjects the licensee to fines and criminal penalties, including imprisonment up to seven years in the discretion of the court. Section 16 of the Act, 7 P.S. §6116.

---

[1] Act of September 2, 1965, P.L. 490, *as amended*, 7 P.S. §§6101-6118.

A regulatory statute is "the result of the exercise of the state's police power to enact regulations to promote the public health, morals or safety, and the general well-being of the community." *Commonwealth v. CSX Transportation, Inc.*, 639 A.2d 1213, 1214 (Pa. Super. 1994) (quoting *Commonwealth v. Harmar Coal Company*, 306 A.2d 308, 316 (Pa. 1973)). The Act is such a statute. It requires those participating in the money transmitter business to "operate in a safe and sound manner" so as not to "prejudice the interest of individuals who use the licensee's services." Section 11.1 of the Act, 7 P.S. §6111.1. This does not make the Act a "consumer protection" statute that must be "interpreted broadly." Dissenting op. at 5.

A "remedial statute" creates, reforms or extends existing rights and includes "consumer protection" legislation. A remedial statute gives an injured person an action to redress a wrongful act. Our Supreme Court has held that where a statute "is remedial it is to be so construed and administered as to advance, that is, to render effective, the remedy. This is the rule of all remedial statutes." *Woodruff v. American Baseball Club of Philadelphia*, 138 A. 497, 501 (Pa. 1927) (quotations omitted). The Unfair Trade Practices and Consumer Protection Law (Consumer Protection Law)[2] has been identified as a remedial statute. *Commonwealth by Shapiro v. Golden Gate National Senior Care LLC*, 194 A.3d 1010, 1023 (Pa. Cmwlth. 2018). Notably, the Consumer Protection Law gives a private right of action to consumers to recover damages from sellers who violate the law. Section 9.2(a) of the Consumer Protection Law, 73 P.S. §201-9.2(a). In *Lopata v. Unemployment Compensation Board of Review*, 493 A.2d 657, 661 (Pa. 1985), our

---

[2] Act of December 17, 1968, P.L. 1224, *as amended*, 73 P.S. §§201-1 – 201-9.3.

MHL-2

Supreme Court described the Unemployment Compensation Law[3] as "remedial" because it provides wage replacement to persons who have lost their employment. *See also* SHAMBIE SINGER & NORMAN J. SINGER, SUTHERLAND STATUTORY CONSTRUCTION §60.2 at 152 (5th ed. 1993) ("Generally, remedial statutes are those which provide a remedy, or improve or facilitate remedies already existing for the enforcement of rights and the redress of injuries.").

The Pennsylvania Money Transmitter Act is not a remedial statute. It does not give consumers a private right of action, as does the Consumer Protection Law, and it does not create benefits, as does the Unemployment Compensation Law. Rather, it imposes limits on persons who would otherwise do the business of transmitting money without restraint. It creates barriers to entry to that business activity. The Act's regulatory regime protects the money transmitting business by limiting its participants to those who are financially strong. To be sure, this regulatory regime also prevents losses to those who use their services. This does not make the Act a remedial statute or consumer protection law. The Act contains significant civil and criminal penalties, and our legislature has instructed that "[a]ll provisions of a statute … shall be strictly construed" where they constitute "[p]enal provisions." 1 Pa. C.S. §1928(b)(1).

_____
MARY HANNAH LEAVITT, President Judge

---

[3] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. §§751-918.10.

Givelify, LLC, Tayo Ademuyiwa   :
and Walle Mafolasire,   :
  :
  :
Petitioners   :
  :
v.   : No. 329 C.D. 2018
  : Argued: February 12, 2019
Department of Banking and   :
Securities,   :
  :
Respondent   :


BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
          HONORABLE ROBERT SIMPSON, Judge
          HONORABLE P. KEVIN BROBSON, Judge
          HONORABLE PATRICIA A. McCULLOUGH, Judge
          HONORABLE MICHAEL H. WOJCIK, Judge
          HONORABLE CHRISTINE FIZZANO CANNON, Judge
          HONORABLE ELLEN CEISLER, Judge


DISSENTING OPINION
BY JUDGE WOJCIK                         FILED: May 30, 2019


Respectfully, I would affirm the Department of Banking and Securities

Commission's (Commission) determination that Givelify, LLC, Tayo Ademuyiwa,

M.D., and Walle Mafolasire (collectively, Givelify) violated former Section 2 of the

Pennsylvania Money Transmitter Act (MTA)[1] by engaging in the business of

---

[1] Act of September 2, 1965, P.L. 490, *as amended*, *formerly* 7 P.S. §6102.

transmitting money, by means of a transmittal instrument, for a fee and on behalf of an individual, without first having obtained a license.[2]  Accordingly, I dissent.

Givelify markets its "Givelify Mobile Giving App" (App) to churches and other non-profit organizations (donees), advertising that the use of its App leads to increased tithes and offerings for a minimal transaction fee.[3]  *See* https://www.givelify.com/churches/ (last visited April 12, 2019).  Givelify's App can be downloaded from Givelify's website, the App Store, and Google Play.

### Using Givelify's Mobile Giving App

In order to receive and deposit donations through the mobile giving app, a donee church or other non-profit first creates an account with Givelify.  To create an account, the donee downloads Givelify's App, enters the organization's name, address, the name of an authorized person, and its checking account information on a form provided, and then uploads that information to Givelify.  Givelify transmits the donee's information to Vantiv,[4] which assigns each donee a Merchant Identification Number (MID).  Donees can update their account information, including their bank account information, through Givelify's website.  S.R.R. at 19b.

---

[2] The Commission determined that Givelify violated *former* Section 2 of the MTA, which provided that, "No person shall engage in the business of transmitting money by means of a transmittal instrument for a fee or other consideration without first having obtained a license . . . ." *Former* 7 P.S. §6102.  *Former* Section 1 of the MTA defined a "transmittal instrument as "any check, draft, money order, personal money order or method for the payment of money or transmittal of credit, other than a merchandise gift certificate . . . ." *Former* 7 P.S. §6101.

[3] There is no charge to donors for the use of Givelify's "pay services."  Supplemental Reproduced Record (S.R.R.) at 65b.

[4] Vantiv is not a licensed money transmitter.

MHW - 2

An individual desiring to make online contributions (a donor) to a Givelify donee also downloads Givelify's App and similarly provides his or her name, billing address, credit/debit card account number, and security code, etc., by uploading that information to Givelify. Givelify transmits the donor's information to Vantiv. Upon receiving the donor's information, Vantiv generates a random and unique number, which the parties refer to as a "token," from which Vantiv can identify the donor's information on its server. Vantiv transmits the token, which now contains only the random unique identifier, to Givelify, and Givelify deletes the donor's account information from its server.

To make a donation, a donor sends a request to Givelify by way of the App. Givelify initiates the desired transaction by simultaneously transmitting the donor's token, the donation amount, and the MID of the identified donee to Vantiv. After Vantiv verifies that there are sufficient funds in the donor's account and notifies Givelify, Vantiv instructs the credit card company or bank to release the funds. The credit card company or bank transfers funds from its possession to a Vantiv account at Fifth Third Bank, which transfers the donation amount to the donee. At the time of that transfer, Givelify's transaction fee, 2.9% plus $0.30 per transaction, is deducted. Givelify pays Vantiv for its services upon receipt of monthly invoices.

Givelify's arrangement with Vantiv and Fifth Third Bank is set forth in a "Bank Card Merchant Agreement," S.R.R. at 1b-7b, which identifies Givelify as "Merchant." In a Special Amendment to the Bank Card Merchant Agreement, the parties agreed that "Merchant [Givelify] is a Payment Service Provider[5] and/or a

_____

[5] Worldpay, formerly Vantiv, defines the term "payment service provider" on its website: "Payment service providers connect merchants to the electronic financial system so they can accept

MHW - 3

Payment Facilitator as defined in the Operating Regulations and therefore is subject to the following: . . . Merchant is financially liable for each transaction." S.R.R. at 10b.

Givelify compares itself favorably to PayPal and Square,[6] both of which are licensed by the Department under the MTA. Givelify also promotes the security of its payment transactions: "*We use* industry-reviewed, military-grade encryption standards to protect all confidential and sensitive data at point of collection, during transmission, and while at rest." S.R.R. at 21b (emphasis added). Givelify explains that its service is safe and secure: "*We* meticulously verify the identity of every organization in our records and *utilize the most robust secure payment processing methods*." *Id.* More specifically, as noted on its website, "Givelify has partnered with Vantiv, the industry leaders in security and payment processing to deliver state of the art PCI Data Security Standard (PCI-DSS) Compliant payment processing." S.R.R. at 23b. Givelify also advertises its utilization of secure, cloud-based data storage: "Givelify uses the same Amazon Web Services data centers trusted by some of the world's leading companies . . . ." S.R.R. at 23b. Givelify's cost for the use of Amazon's data services is not reflected in the record.

---

credit and debit card payments. . . . [P]ayment service providers make modern commerce possible by providing the connective financial tissue between merchants, consumers, card brand networks and financial institutions." https://www.vantiv.com/payment-processing/payment-service-provider-explained-and-players-involved (last visited April 12, 2019).

[6] Givelify describes itself as "Less complicated than Pay[]Pal . . . Simpler and quicker than Square." S.R.R. at 15b.

## Interpreting and Applying the MTA

In interpreting the MTA, we must be mindful that it is a consumer protection statute. As such, it should be interpreted broadly in order to serve its intended purpose, in this case, protecting the tithes of church members who wish to donate to their houses of worship. At issue is *former* Section 2 of the MTA, which provided that, "No person shall engage in the business of transmitting money by means of a transmittal instrument for a fee[7] or other consideration without first having obtained a license . . . ." *Former* 7 P.S. §6102.

I agree with the Commission's conclusion that Givelify's software/business model constitutes a "transmittal instrument" as defined by *former* Section 1 of the MTA ("*any . . . method* for the payment of money or transmittal of credit"). *Former* 7 P.S. §6101 (emphasis added). As the Commission aptly explains, the Givelify Mobile Giving App electronically collates information individually identifying each donee and donor, and its transmission of that data is integral to the process of moving money from an individual donor's credit or debit account to the bank account of the church or other non-profit entity. Ultimately, the App operates as the functional equivalent of a check. That the App uses tokens and MIDs in the transmission of this information does not impact the result: Givelify's customer receives a donation from an online donor - generally a church member - and pays Givelify a fee for the transaction. Thus, I would hold that these facts satisfy the statutory criteria: Givelify's critical participation in the transmission of each donation constitutes "engaging in the business of"; Givelify's App functions as the equivalent of a check and is a transmittal instrument; and Givelify is the entity that

---

[7] There is no dispute that Givelify is the entity that charges each donee a fee for each transaction.

charges churches a fee for every transaction which accomplishes the transmission of money.

I disagree with the Majority's conclusion that Givelify's agreements to use the services of Vantiv, Fifth Third Bank, and/or Amazon preclude a determination that Givelify is "engaging in the business of transmitting money." The Majority considers that "engaged in" expresses the requirement that an individual or organization be operating a business, and has been construed to mean activity that occupies time and attention, as opposed to activity that is occasional or irregular. Majority op. at 11-12. Of course, Givelify is indeed operating a business, a business that advertises *its App* as an efficient and secure *means by which* monetary donations can be initiated and received.

The Majority's analysis suggests that Givelify's reliance on Vantiv to directly access the Federal Reserve Automated Clearinghouse network somehow diminishes Givelify's "engagement" in the donation process. However, in my view, the fact that Givelify engages the services of Vantiv, with which the churches have no relationship or contacts, does not diminish or alter the character of Givelify's integral role in the transactions. Indeed, the Majority's characterization of Givelify's participation in the donation process as "tangential involvement" ignores the overwhelming evidence of record, which establishes that: Givelify markets the "church giving app";[8] Givelify is the first and, in fact, the only entity with which churches and their members have contact; Givelify contracts with other businesses and utilizes their services to complete the transmissions of money, which are initiated by donors and delivered to donees by way of Givelify's App; Givelify is the entity that churches create accounts with, and the entity that churches pay to

_____

[8] *See* https://www.givelify.com/churches/ (last visited April 12, 2019).

collect and deposit donations. Simply put, without Givelify there would be no donation.

Stated otherwise, the only service Givelify offers donees and donors is the transmission of money. Givelify is the only corporate entity with which churches and donors directly do business and through which payments to churches are both initiated and completed. Givelify's marketing emphasizes the security of its giving App. Yet Givelify absolved Vantiv and Fifth Third Bank of liability in the Merchant Agreement and at the same time denied responsibility for any loss or damages in the fine print of its agreements with consumers.

In my view, by interpreting the subcontracting of a few steps of the multi-step donation process as effectively removing Givelify from the business of transmitting money, the Majority allows Givelify to profit from the donation transmission process and evade liability or financial responsibility to churches and church members alike.

Accordingly, I respectfully dissent.

_____
MICHAEL H. WOJCIK, Judge